# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CT-00793-SCT

*MONICA ASHBROOK DARBY AND ANDREW*
*ROSS DARBY*

*v.*

*HAROLD COMBS, KARRON COMBS AND*
*CRYSTAL JOHANNA COMBS*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 04/27/2015 |
| TRIAL JUDGE: | HON. MITCHELL M. LUNDY, JR. |
| COURT FROM WHICH APPEALED: | DeSOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | TRACY BUSTER WALSH |
| ATTORNEYS FOR APPELLEES: | A. E. (RUSTY) HARLOW, JR. |
| | KATHI CRESTMAN WILSON |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 11/09/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     In this custody case, the chancellor found the natural parents unfit to retain custody of their young daughter. After considering the child's best interest and conducting an ***Albright***[1] analysis, the chancellor awarded joint custody to the child's maternal great-grandparents and paternal grandmother. The paternal grandmother appealed. She argued

---

[1] ***Albright v. Albright***, 437 So. 2d 1003 (Miss. 1983).

Mississippi Code Section 93-5-24 (Rev. 2013) prohibits joint-custody awards to third parties.

¶2.    We assigned this case to the Court of Appeals, and the appellate court affirmed the chancellor's decision. *Darby v. Combs*, 2016 WL 6276610 (Miss. Ct. App. Oct. 25, 2016). The paternal grandmother then petitioned this Court for certiorari review, which was granted. After review, we find Section 93-5-24 allows joint-custody awards among third parties. Thus, the chancellor did not abuse his discretion, and the Court of Appeals was right in recognizing as much. We therefore affirm.

**Background Facts and Procedural History**

¶3.    Adriana Rose Darby (Addie) was born to unwed parents on February 11, 2013. Her mother Crystal Combs was eighteen. Her father Andrew Darby was twenty. Crystal lived with her grandparents, Harold and Karron Combs. The Combses had cared for Crystal since she was three years old, after obtaining full custody of her by court order. Andrew Darby lived with his parents, Ross and Monica Darby. He frequently visited Crystal and Addie at the Combses' home.

¶4.    Crystal was Addie's primary caregiver following her birth. But on August 20, 2013, Monica Darby filed a petition for custody or, alternatively, visitation with Addie. She alleged Crystal and Andrew had neglected Addie and were unable to care for her properly. Crystal and Andrew each answered and requested custody of Addie. Andrew also sought a filiation order, declaring him Addie's father. Because of the neglect allegations, the chancellor appointed a guardian ad litem (GAL). The GAL was ordered to investigate and prepare a written report with her recommendations.

¶5.    On February 24, 2014, Monica Darby filed a motion for a temporary restraining order (TRO). She cited Crystal's arrest for drug paraphernalia the previous week. The chancellor granted the TRO. He temporarily awarded full custody of Addie to Monica and set a preliminary injunction hearing. Soon after, the Combses filed a motion to intervene, which was granted. They asked the chancellor to award them custody of Addie and declare Crystal and Andrew unfit.

¶6.    At the preliminary injunction hearing on March 18, 2014, the chancellor found Addie would be irreparably harmed unless Mrs. Darby continued to have full custody. His order enjoined Crystal from any contact with her daughter. On April 15, 2014, the chancellor entered an order granting the Combses' request for visitation with Addie, stipulating Crystal would have no contact with Addie. The chancellor later amended the order to give Crystal supervised visitation.

¶7.    On October 2, 2014, and December 18, 2014, the chancellor heard arguments on Mrs. Darby's custody petition. There was extensive testimony and evidence about Crystal's and Andrew's parental fitness. Harold Combs testified that Andrew had twice attempted suicide at their home by cutting his arms. Both times the police were summoned. On another occasion, Andrew was charged with domestic violence and simple assault. He had thrown a telephone at Crystal while she was holding Addie. The telephone struck Crystal in the head, and she was taken to the hospital for stitches.

¶8.    Monica Darby testified that on August 6, 2014, Andrew smacked Ross Darby in the head with a skillet during an argument. Ross had to have the wound stapled, and Andrew

3

faced criminal charges for the incident. There was also testimony about Andrew's history of drug and alcohol abuse.

¶9. Andrew's history of mental illness was also highlighted, including bipolar disorder and schizophrenia. Andrew had received mental-health treatment on several occasions. At one point, he was committed to the state hospital in Tupelo. After his discharge, Andrew moved to Jonesboro, Arkansas, to live with his grandparents and attend college at Arkansas State University. Monica testified that Andrew receives outpatient treatment and is doing well.

¶10. Crystal's fitness was similarly at issue. She admitted she could not provide a stable home for Addie at that time. Crystal testified about her own drug use. She explained that she and Andrew had used drugs and alcohol with Mr. Darby, without Mrs. Darby's knowledge. Karron Combs testified that Crystal was arrested for possessing drug paraphernalia in February 2014. This was when she and her husband first discovered Crystal was using drugs. Karron viewed her granddaughter as an accomplished liar who had fooled them about her drug use. Crystal admitted using drugs at the Combses' home. She claimed they were unaware because she had concealed her drug use from them. According to Karron, Crystal later completed a drug rehabilitation program. Since then, her attitude and behavior had improved greatly.

¶11. The chancellor commented on the "very disturbing" nature of the case. He said he faced a scenario where "both parents are admittedly unfit to have custody." Citing this dilemma, he proceeded under Mississippi Code Section 93-5-24(1)(e) and arranged third-

4

party custody between Monica and the Combses. Though he found this arrangement was in Addie's best interest, his *Albright*[2] analysis recognized that Monica and the Combses "le[ft] a lot to be desired."

¶12. Both sides believed they were best suited for custody of Addie. Karron testified she and Harold Combs were fully able to care for her. Harold has no significant health problems and is a computer programmer with flexible hours. And Karron is a retired teacher. While she has some health problems, she said her conditions are managed and would not interfere with her ability to care for Addie. Both Harold and Karron agreed that Crystal was unfit for child custody and that any visitation with Addie should be supervised.

¶13. Monica testified that she was Addie's primary caregiver since the TRO was granted in March 2014. She works for a utility company during the week. But her hours are flexible, and Addie was in daycare while she worked. In addition to Addie, Monica cares for three other children—ages fifteen, thirteen, and nine. Each is thriving in school and extracurricular activities. Monica has a health problem she manages with medication, which she insisted

---

[2] When making a custody determination, chancellors must weigh factors such as:

> [The] health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.

*Albright*, 437 So. 2d at 1005.

does not affect her ability to care for Addie or the other children.

¶14.  The GAL report was admitted in evidence.  She also testified at the hearing.  The GAL recommended Monica be awarded custody of Addie with the Combses receiving visitation.  The GAL found that neither Andrew nor Crystal could provide a safe and stable environment for Addie.  She recommended any visitation granted to them be supervised.  She believed the Combses' failure to recognize and address Crystal's destructive behavior had endangered Addie.  The GAL also faulted the Combses for allowing the toxic relationship between Crystal and Andrew to continue in their home.  But she still felt Addie's best interests required the Combses' continued involvement in her life.

¶15.  In his January 23, 2015 order, the chancellor found it in Addie's best interest that Monica and the Combses share joint physical custody.  He fashioned an arrangement in which Monica had custody of Addie while Andrew was away at college.  And the Combses would have custody during alternating weekends, holidays, and the summer months.  The chancellor also set a visitation schedule.  He ordered that any visitation by Andrew or Crystal be supervised.  He further ordered Monica to pay one half of the $3,000 GAL fee and the Combses the other half.

¶16.  On February 4, 2015, the chancellor clarified his January order with specific *Albright* findings, including his reasons for rejecting the GAL's recommendations.  The chancellor found Addie's age, health, and sex favored neither party.  He found the continuity-of-care factor favored Monica, because she had full custody of Addie since February 14, 2014.  The chancellor recognized all parties had difficulties parenting, due to Andrew's drug and

6

mental-health problems and Crystal's drug issues. So he found this factor neutral. The chancellor also found the moral-fitness factor to be neutral, since both parties had condoned Andrew's sexual activity with Crystal while she was underage.

¶17. As to the stability of the home environment, the chancellor found this factor favored the Combses, because he was unsure Monica and Ross Darby would remain married. The two had separated after Andrew struck Ross with the skillet. The chancellor found both parties were willing and able to provide primary child care. But the factor concerning physical health favored Monica, who was more suited to handling the daily rigors of Addie's schooling. The employment factor was deemed to favor the Combses, because Monica's job takes her from home each day. The chancellor determined Addie's home, school, and community record was not applicable to the case. Lastly, he found the emotional-ties factor favored neither party. He recognized both parties loved Addie and there was no evidence she did not love each of them.

¶18. Because of his concerns with Andrew, the chancellor rejected the GAL's recommendation that Monica be given sole custody of Addie. Based on Andrew's mental-health issues and the previous violence in Monica's home, he concluded "the safest route" was for Addie to reside with Monica only when Andrew was in school.

¶19. Monica filed a motion to reconsider, and on April 27, 2015, the chancellor entered an amended judgment further clarifying his opinion. The chancellor declared Andrew to be Addie's natural father. The chancellor also clarified that joint physical and joint legal custody would be shared by Monica and the Combses. The chancellor directed Andrew and

7

Crystal "pay $100.00 each per month by the 5th of each month as child support to whomever has the primary custody of Addie for that month." The chancellor also clarified the visitation schedule.

¶20. Monica appealed. She challenged the joint-custody award and claimed the chancellor wrongly denied her any holiday visitation. She also argued the chancellor abused his discretion by assessing her a portion of the GAL fees, and by entering a vague and ambiguous child-support award. This Court assigned her appeal to the Court of Appeals, which found no merit to her claims. Monica sought certiorari review by this Court. She raises just one issue—that the Court of Appeals erred in affirming the joint-custody award.

### Discussion

¶21. We apply a limited standard of review in child-custody cases. *Johnson v. Gray*, 859 So. 2d 1006, 1012 (Miss. 2003). We will not reverse a chancellor's factual determinations unless manifestly wrong or clearly erroneous. *Id*. Questions of law are reviewed de novo. *Vaughn v. Davis*, 36 So. 3d 1261, 1264 (Miss. 2010).

¶22. Monica argues the governing custody statute does not allow chancellors to award joint custody to parties other than the child's natural parents. And even if the statute permitted this custody arrangement, the chancellor failed to make a necessary express finding that she and the Combses could cooperate as Addie's joint custodians.

### I.    Third-Party Joint Custody

¶23. Chancellors have jurisdiction to make custody decisions. *See* Miss. Const. art. 6, § 159; *see also Davis v. Davis*, 194 Miss. 343, 12 So. 2d 435, 436 (1943). And their

8

decisions must be made with an eye on the best interests and welfare of the child. ***Albright***, 437 So. 2d at 1005; ***Carr v. Carr***, 480 So. 2d 1120 (Miss. 1985) (extending the coverage of the ***Albright*** decision to all original custody decisions)). Here, the Court of Appeals correctly recognized this notion, explaining "[i]n a custody contest between third parties, where neither party has a superior right to custody of the child, the child's best interests and welfare are the polestar consideration." ***Darby***, 2016 WL 6276610, at *7.

¶24. With Addie's best interests in mind, and in light of his finding that Crystal and Andrew were unfit parents, the chancellor consulted Section 93-5-24(1)(e). This statute clearly permits third-party custody arrangements. Under Section 93-5-24(1)(e):

> Upon a finding by the court that both of the parents of the child have abandoned or deserted such child or that both such parents are mentally, morally or otherwise unfit to rear and train the child the court may award physical and legal custody to:
>
> > (i) The person in whose home the child has been living in a wholesome and stable environment; or
> >
> > (ii) Physical and legal custody to any other person deemed by the court to be suitable and able to provide adequate and proper care and guidance for the child.

Miss. Code Ann. § 93-5-24. So, based on his finding of parental unfitness, the chancellor was statutorily empowered to fashion a third-party-custody award. Monica does not seriously contest the chancellor's authority to grant third-party custody. What she argues is that the chancellor lacked authority to craft a third-party *joint* custody award.

¶25. As support, Monica latches on to the use of the word "person" and the phrase "any other person" in Section 93-5-24(1)(e)(i) and (ii). She insists this singular language makes

9

clear that only one person or party may receive custody. So as she sees it, *joint custody* awards are not allowed between third parties under Section 93-5-24(1)(e)(i) and (ii). She suggests the definition of joint physical custody in Section 93-5-24(5)(c) supports her interpretation.[3] We disagree.

¶26.    First, it is obvious Subsection 93-5-24(5)(c) contemplates joint physical custody between "parents." And here, the chancellor deemed Addie's parents unfit for custody.

¶27.    Second, Monica overlooks—and our statutory law instructs—that "[w]ords used in the singular number only, either as descriptive of persons or things, shall extend to and embrace the plural number . . . except where a contrary intention is manifest." Miss. Code Ann. § 1-3-33 (Rev. 2014). And we see no contrary intention manifested within the statute.

¶28.    Indeed, Section 93-5-24(5) concludes by explaining that "[a]n award of *joint physical and legal custody* obligates the *parties* to exchange information concerning the health, education and welfare of the minor child and . . . the *parents or parties* shall confer with one another in the exercise of decision making rights, responsibilities, and authority." So, Section 93-5-24(5) suggests that joint physical and legal custody may be awarded to either parents or parties. Thus, we find no legal error in the chancellor's statutory application.

¶29.    As we recognized in ***Crider,*** the overarching consideration in Section 93-5-24 is that

---

[3] Section 93-5-24(5)(c) defines joint physical custody as:

> For the purposes of this section, "joint physical custody" means that each of the parents shall have significant periods of physical custody. Joint physical custody shall be shared by the parents in such a way so as to assure a child of frequent and continuing contact with both parents.

Miss. Code Ann. § 93-5-24.

"[c]ustody shall be awarded as follows according to the best interests of the child." ***Crider v. Crider***, 904 So. 2d 142, 144 (Miss. 2005). And here, we cannot say the chancellor's custody award was against Addie's best interest.

## II.     Cooperation for Joint Custody

¶30.    Monica next suggests the chancellor erred by awarding joint custody without making an express finding that the parties could cooperate as Addie's joint custodians. We disagree. As discussed, the chancellor carefully walked through the ***Albright*** factors[4] and crafted a workable third-party custody arrangement.

¶31.    Though joint custody between third parties may not typically be preferable, this is a difficult and, as the chancellor put it, "unusual" case. Facing the realities of obviously unfit parents and a neglected child, the chancellor did what he was duty bound to do—he consulted Section 95-5-24 and keyed in on the child's best interest and welfare.[5] The severity of Andrew's drug problems, mental-health issues, and violent tendencies and Crystal's extensive drug and alcohol abuse required the chancellor look elsewhere for custody arrangements.

¶32.    When parents cannot agree on who should have primary custody of the children, this Court has *suggested* "it is *probably the better course* for the chancellor to make that decision for them reserving joint custody for parents who are willing to work together to make joint

---

[4] ***Albright***, 437 So. 2d at 1005.

[5] *See **Crider***, 904 So. 2d at 144 (this Court has "clearly declared time and time again that the polestar consideration in all cases dealing with child custody . . . is the best interest and welfare of the child.") (citations omitted).

11

custody feasible." ***Waller v. Waller***, 754 So. 2d 1181, 1184 (Miss. 2000) (emphasis added).[6]

The dissent basically stretches this language into a new affirmative requirement, essentially grafting a non-***Albright*** factor onto the ***Albright*** test. And it concludes remand is necessary because the chancellor did not make an "express determination of whether the parties can cooperate in exercising joint custody." We agree this consideration is certainly relevant. But by no means did ***Waller*** create a new mandate that chancellors make this "express determination," or else a joint-custody award and ***Albright*** analysis will be legally lacking and require remand for additional findings. Rather, the ***Waller*** court, citing an American Law Report on joint-custody awards, suggests in a footnote that chancellors make joint-custody awards where the parties are able to cooperate. ***Id***. at 1184 n.1 (citations omitted).

¶33.   Here, the chancellor rejected the GAL's recommendations and carefully weighed the ***Albright*** factors and statutory law, deciding a joint-custody award was "the safest route" to protect Addie from potential violence. He had no qualms that Monica and the Combses could carry out this arrangement. If he had felt a joint-custody arrangement was unworkable, he would not have fashioned one. After review, we find no error in the chancellor's joint-custody award.

**Conclusion**

¶34.   We find Section 93-5-24 permits third parties to share joint custody when the child's parents have been found unfit and joint custody is in the child's best interest. And the

---

[6] The same was true in ***Crider***, in which this Court said the chancellor is responsible for ensuring the parties "are capable of cooperating in a joint custody arrangement." ***Crider***, 904 So. 2d at 148. But again, no new rule or requirement mandating an express, separate finding of cooperation between the parties was created.

chancellor was not required to make an express finding that Monica and the Combses could cooperate as Addie's joint custodians.

¶35. **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR. KITCHENS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KING, J. ISHEE, J. NOT PARTICIPATING.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶36. I agree that the chancellor was fully empowered under our statutes to award joint custody of Adriana Rose Darby (Addie) to her paternal grandmother, Monica Darby, and to her maternal great-grandparents, Harold and Karron Combs. But I would hold that, when a chancellor orders third parties from different households to share custody of a child, with all the attendant duties of cooperation that this endeavor entails, the chancellor reversibly errs by failing to make an express finding that the parties can cooperate willingly in the rearing of that child. I would find that Addie's best interest requires that this Court reverse and remand for the chancellor to make an express determination of whether Monica Darby and the Combses, who have displayed little or no predilection for cooperation in the past, are capable of willingly cooperating as joint custodians of Addie.

¶37. In *Rutledge v. Rutledge*, this Court held that:

> The essence of joint custody is that both parents share responsibility and authority with respect to the children. This involves parental consultation and agreement on all major decisions affecting the children. The decision making process thus approximates that of an intact nuclear family. Parents with joint custody make joint decisions on all matters having a significant impact on their children's lives.

13

***Rutledge v. Rutledge***, 487 So. 2d 218, 219 (Miss. 1986). "[T]he cardinal criterion for an award of joint custody is . . . mutual ability to cooperate in reaching shared decisions in matters affecting the child's welfare." ***Waller v. Waller***, 754 So. 2d 1181, 1184 n.1 (Miss. 2000). "Cooperation between the parents is paramount even in jurisdictions where there is a presumption that joint custody is in the best interest of the child." ***Id.*** This Court has expressed that joint custody should be awarded only when the purported joint custodians "are willing to work together to make joint custody feasible." ***Id.*** at 1184. In ***Crider v. Crider***, we clearly announced that "unless the parents are capable of sharing joint custody cooperatively, it is incumbent upon a chancellor not to award joint custody." ***Crider v. Crider***, 904 So. 2d 142, 147 (Miss. 2005).

¶38.    The import of these decisions is that, if the chancellor believes that the purported joint custodians cannot cooperate willingly, then joint custody is not in the best interest of the child. And the chancellor's duty to consider the ability of purported joint custodians to cooperate willingly fits smoothly within the ***Albright*** framework. *See **Albright v. Albright***, 437 So. 2d 1003, 1005 (Miss. 1983) (in making a custody determination, the chancellor must make findings on factors including the parties' willingness and capacity to provide primary child care).

¶39.    Further, ***Crider*** clarified that determining the parties' ability to cooperate in sharing joint custody is a matter within the chancellor's sound discretion. We found that the chancellor "is in the best position to evaluate the credibility, sincerity, capabilities and intentions of the parties" regarding their ability to cooperate in the exercise of joint custody. ***Crider***, 904 So. 2d at 147. "It is the chancellor's responsibility to ensure that the parents [or

14

parties] are capable of cooperating in a joint custody arrangement." *Id.* at 148.

¶40. It is true that the chancellor carefully considered the *Albright* factors to determine the custodial arrangement that would be in Addie's best interest. In doing so, the chancellor weighed the evidence after hearing the trial testimony, observing the demeanor of the witnesses, and reviewing the exhibits. The chancellor explained that the evidence of violence in Mrs. Darby's home, coupled with Andrew Darby's mental condition and his expected periodic presence in her home, caused him to reject the GAL's recommendation that Mrs. Darby have sole custody. However, in his orders the chancellor did not address explicitly the fact that the award of joint custody will require Mrs. Darby and the Combses to cooperate willingly in making parenting decisions in Addie's best interest.

¶41. The majority speculates, and ultimately decides, that the chancellor's award of joint custody means that he implicitly found that the parties could cooperate. I reject this approach. A child custody arrangement is one of the most consequential and weighty decisions a chancellor ever makes. It is a decision of no small import when a chancellor orders third parties, with no history of cooperation in any matter whatsoever, to share physical and legal custody of a minor child, an undertaking that necessitates countless coordinated exercises of responsibility, authority, and significant decision making. This Court should not imply or surmise, in such circumstances, that such a finding was made. I would hold that an express determination of whether the parties can cooperate willingly in exercising joint custody is necessary when joint custody is awarded to third parties who are members of different households. Because the chancellor made no such express determination, I would reverse the award of joint custody and remand for fact findings on whether Monica Darby and the

15

Combses are capable of and committed to genuine cooperation in the rearing of Addie, and whether they are willing and able to exercise such cooperation. The chancellor should render a new custody determination under the factors from *Albright* if he finds that the parties are incapable of, or unlikely to engage in, willing cooperation.

**KING, J., JOINS THIS OPINION.**