# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00140-COA

SHERRY ANN CAMPBELL GRAVES PAGE                  APPELLANT

v.

BRYAN EDWARD GRAVES                               APPELLEE

DATE OF JUDGMENT: 11/15/2017
TRIAL JUDGE: HON. JOHN C. McLAURIN JR.
COURT FROM WHICH APPEALED: RANKIN COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT: JOHN SAMUEL GRANT IV
CONNIE MARIE SMITH
ATTORNEYS FOR APPELLEE: CHRISTOPHER TABB
BRYAN EDWARD GRAVES (PRO SE)
NATURE OF THE CASE: CIVIL - DOMESTIC RELATIONS
DISPOSITION: REVERSED AND REMANDED - 09/10/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Sherry Ann Campbell Graves Page appeals from an order of the Rankin County Chancery Court dismissing her motion for modification of child custody. Sherry filed a motion to reconsider, which the chancellor denied.

¶2. Sherry now appeals, arguing that the chancellor erred by: (1) dismissing the case, despite the fact that Sherry presented sufficient evidence on every required element for custody modification, and (2) failing to consider the totality of the circumstances.

¶3. We find that the chancellor erred in dismissing Sherry's motion for modification of child custody, and we reverse and remand this case for further proceedings consistent with

this opinion.

**FACTS**

¶4. Sherry and Bryan Graves married on July 10, 2004. During the marriage, Sherry gave birth to two daughters: Anna in 2007 and Sarah in 2010.[1] Anna and Sarah were both diagnosed with autism and have special needs.

¶5. On October 18, 2013, Sherry and Bryan constructively separated. On May 14, 2014, Sherry and Bryan entered a joint motion consenting to a trial and a divorce on the grounds of irreconcilable differences. Sherry and Bryan agreed to allow the court to decide the following issues: child support, child custody, alimony, guardian ad litem (GAL) fees, property division, and payment of debts. On May 16, 2014, the chancellor appointed a GAL "to investigate, find facts, and make an independent report to the [chancellor]."

¶6. A judgment of divorce was entered on July 24, 2014. In the judgment, the chancellor ordered that the "Marital Dissolution Agreement" be incorporated into the judgment of divorce. The Marital Dissolution Agreement set forth the following child custody arrangement:

> [Bryan] shall have legal and physical custody of the minor children subject to [Sherry's] reasonable visitation. [Sherry] shall receive one week each month to be mutually agreed upon by the parties. [Sherry's] visitation shall take place in the city in which the children are resided which is anticipated to be Monroe, Louisiana. [Sherry's] visitation shall be supervised by [Bryan] or a member of [Bryan's] family or someone approved by [Bryan]. In the event [Sherry] is unable to visit with the children in the home of [Bryan] or [Bryan's] parents, then [Sherry] shall return the children to their home at 8:00 p.m. each evening. [Sherry] shall be responsible for scheduling and arranging all visitation periods with the minor children.

---

[1] For privacy purposes, the minor children's names have been changed.

After the entry of the judgment of divorce, Sherry moved to Virginia and eventually married David Page. As anticipated by the Marital Dissolution Agreement, Bryan moved Anna and Sarah to Monroe, Louisiana. The record reflects that Bryan's stepmother and sister both worked as special education teachers and had agreed to help him care for Anna and Sarah.

¶7. Less than one year later, on May 12, 2015, Sherry and Bryan entered into an agreed order of visitation which granted Sherry unsupervised visitation with Anna and Sarah. The chancellor also lifted the requirement that the visitation occur in Monroe. The order stated that "Bryan shall continue to have physical and legal custody of the minor children," and the order provided Sherry with approximately three months for summer visitation, stating: "Sherry [s]hall have the children for the summer beginning the 10th day after school recesses and ending [seven] days prior to school resuming." The chancellor also ordered that "[d]uring summer visitation, Sherry shall enroll the children in therapy in Virginia comparable to what they are receiving in Monroe, and shall provide the therapists' names and addresses to Bryan so that he can give that information to the Monroe therapists."

¶8. In May through August of 2015, the girls lived with Sherry and her husband, David, in Virginia, per the modified visitation order. In August 2015, Bryan and Sherry agreed that Anna and Sarah would remain in Virginia with Sherry indefinitely. This arrangement ultimately lasted from May 2015 until September 2017—just under two-and-a-half years. During this time, Anna and Sarah attended school in Virginia and continued to receive therapy.

¶9. While Anna and Sarah were living in Virginia, Bryan moved from Monroe to Clinton,

3

Mississippi. He lived with a friend for approximately a year, and then he moved into the home of his girlfriend, Stacy, who also lived in Clinton.

¶10. At the end of August 2017, Anna and Sarah started back to school. The record reflects that after attending their first week of school, Bryan and Stacy took Anna and Sarah on vacation to Florida. During this trip, which occurred in September 2017, Anna and Sarah met Stacy for the first time. At the end of the trip, Bryan refused to let the girls return to Virginia; instead, he moved Anna and Sarah in to live with him and Stacy. Bryan also enrolled Anna and Sarah in school in Clinton.

¶11. Approximately one month later, Bryan and Stacy broke up. Bryan and the girls moved out of Stacy's house and into an apartment. The record reflects that Bryan's new apartment was located in a different school district than Stacy's house, so Bryan enrolled Anna and Sarah in another school.

¶12. On October 3, 2017, Sherry filed a motion for modification of child custody. In the motion, Sherry alleged that since the May 2015 agreed order of visitation, "there has been a material change in circumstances which adversely affects the minor children." Sherry stated that Anna and Sarah had lived with Sherry and David in Virginia from May 13, 2015, until September 2017.

¶13. A trial was held on the matter on November 1, 2017. During Sherry's case-in-chief, the chancellor heard testimony from Anna and Sarah's special education teacher in Clinton; their teacher/therapist in Virginia; a teacher's assistant in Virginia; Bryan (adversely); and Sherry. We discuss this testimony in detail below.

4

¶14. After presenting their case-in-chief, Sherry's attorney rested. Bryan then moved to dismiss the case. After hearing arguments from the parties, the chancellor granted Bryan's motion and found as follows: "I do not find that there has been a substantial and material change in circumstances adverse to the welfare of these children in their present situation," explaining "[t]he circumstances that were existing at the time of the divorce with regard to these children are very similar to what's existing today[.]"

¶15. On November 15, 2017, the chancellor entered an order memorializing his ruling granting Bryan's motion to dismiss and dismissing Sherry's motion for modification with prejudice. The chancellor held that Sherry "has failed to prove that there has been a material change in circumstances that adversely affects the minor children herein."

¶16. Sherry filed a motion to reconsider and argued that, among other things, the chancellor should not have dismissed the case when the evidence showed Bryan had voluntarily allowed the children to be in Sherry's care for more than two years before he took them back. Sherry also asserted that the chancellor failed to consider the totality of the circumstances. After hearing arguments, the chancellor denied Sherry's motion to reconsider.

¶17. Sherry now appeals.

**STANDARD OF REVIEW**

¶18. On appeal of a chancellor's denial of motion for modification of child custody based on a material change in circumstances, "[t]his Court employs a limited standard of review in child-custody cases and will affirm findings of fact by chancellors when they are supported by substantial evidence unless the chancellor abused her discretion, was manifestly wrong,

clearly erroneous or an erroneous legal standard was applied." *Carter v. Carter*, 204 So. 3d 747, 756 (¶37) (Miss. 2016) (internal quotation mark omitted). We recognize that "findings of fact made by a chancellor may not be set aside or disturbed upon appeal if they are supported by substantial, credible evidence." *Id*. We review questions of law de novo. *Campbell v. Watts*, 192 So. 3d 317, 318 (¶5) (Miss. Ct. App. 2015).

¶19. In their appellate briefs, both Sherry and Bryan argue that the standard of review for the chancellor's denial of Sherry's motion for modification of child custody based on a material change in circumstances is de novo. They assert that where the chancellor failed to consider the totality of the circumstances in a modification action, this Court has held that "the chancellor applied an incorrect, or rather, an incomplete legal standard." *Powell v. Powell*, 976 So. 2d 358, 362 (¶15) (Miss. Ct. App. 2008).

**DISCUSSION**

¶20. Sherry argues that the chancellor erred in dismissing her motion for modification of child custody. Sherry maintains that she presented sufficient evidence on every element of her claim showing that a material change in circumstances had occurred in the custodial home, and that the change adversely affected Anna and Sarah. Sherry also argues that the chancellor failed to consider the totality of the circumstances when determining whether a material change in circumstances occurred.

¶21. Mississippi Rule of Civil Procedure 41(b), which governs involuntary dismissals, "applies in actions tried by the court without a jury, where the judge is also the fact-finder." *All Types Truck Sales Inc. v. Carter & Mullings Inc.*, 178 So. 3d 755, 758 (¶13) (Miss. Ct.

6

App. 2012) (internal quotation marks omitted). "A judge should grant a motion for involuntary dismissal if, after viewing the evidence *fairly*, rather than in the light most favorable to the plaintiff, the judge would find for the defendant." *Id*. (quoting *Gulfport-Biloxi Reg'l Airport Auth. v. Montclair Travel Agency Inc.*, 937 So. 2d 1000, 1004-05 (¶13) (Miss. Ct. App. 2006)). "The court must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." *Id.*; *see also Shows v. Cross*, 238 So. 3d 1224, 1232 (¶33) (Miss. Ct. App. 2018).

¶22. On appeal, we review a chancellor's decision to grant a Rule 41(b) dismissal in a modification of child custody action "under the deferential substantial-evidence/manifest-error standard." *Shows v. Cross*, 238 So. 3d at 1232 (¶33). "Under this standard, we must affirm unless the chancellor applied an incorrect legal standard or made manifestly wrong or clearly erroneous factual findings." *In re Bowling*, 155 So. 3d 907, 911 (¶21) (Miss. Ct. App. 2014).

¶23. This Court has recognized that "[a] modification of custody is warranted when the moving parent successfully shows (1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child." *Voss v. Doughty*, 242 So. 3d 952, 956-57 (¶13) (Miss. Ct. App. 2018) (quotation omitted). "A change in circumstances is a change in the overall living conditions in which the child is found, and the totality of the circumstances must be considered." *Gainey v. Edington*, 24 So.

3d 333, 336 (¶11) (Miss. Ct. App. 2009) (citation and internal quotation marks omitted). "[T]he material change in circumstances must [also] be unforeseeable at the time of the original decree." *Giannaris v. Giannaris*, 960 So. 2d 462, 469 (¶12) (Miss. 2007). We recognize that "[m]atters involving child custody are within the sound discretion of the chancellor." *Heisinger v. Riley*, 243 So. 3d 248, 256 (¶30) (Miss. Ct. App. 2018).

¶24. As the parent requesting a change of child custody, Sherry bears the burden of proving a material, adverse change in circumstances by a preponderance of the evidence. *Voss*, 242 So. 3d at 956 (¶13). If the movant meets her burden of showing a material, adverse change in circumstances, the chancellor must then "apply the *Albright*[2] factors to determine whether modification is in the child's best interest." *Id*. "However, if there has been no material, adverse change in circumstances, the *Albright* factors need not be addressed." *Id*. at 957 (¶13).

¶25. We now turn to review the testimony and evidence presented at trial during Sherry's case-in-chief. The record reflects that the chancellor first heard testimony from Amanda Langford, Anna and Sarah's special education teacher when they briefly lived with Bryan and Stacy in Clinton. (Amanda testified that at the time of trial she was aware that Anna and Sarah had moved to a different school district.)

¶26. Amanda stated that both Anna and Sarah were autistic, and she explained that Sarah utilized a feeding tube for nutrition. Regarding Sarah's feeding tube, Amanda testified that Sarah was not fed or provided with anything to drink during the school day. As far as

---

[2] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

academics, Amanda testified that she reviewed Anna's and Sarah's school records from Virginia, and she stated that they would be following basically the same academic program in Mississippi.

¶27.   Sherry's counsel asked Amanda how well Anna and Sarah adjust to change, and Amanda answered: "Not very well.  I mean, they did good, you know, coming in [to a new school], as good as could be expected."  When Sherry's counsel asked if there was ever a time when she was concerned about the girls, Amanda answered, "No."  However, when asked if there was ever a time when she felt that Anna and Sarah did not have on appropriate attire, Amanda answered, "Yes."  Amanda explained that when the weather turned cold, Anna and Sarah did not have on coats or long pants.  Amanda testified that she contacted both Bryan and Stacy "several, several times" regarding her concerns about the girls' hygiene and clothing.  Amanda stated that this problem was eventually cured.

¶28.   Amanda also testified regarding a time when she noticed that Anna and Sarah exhibited poor hygiene, explaining that "four weeks ago," she observed that their hair and teeth had not been brushed.  Amanda testified that she recalled two particular days when Sarah arrived at school "very, very exhausted and she could hardly keep her eyes open."  Amanda approached Bryan about Sarah's exhaustion and, according to Amanda, Bryan said "that [Sarah] had stayed up late" playing on her iPad "and that she would probably be tired, try to let her rest."  On cross-examination, Amanda confirmed that as a teacher, she is obligated to contact the Department of Human Services (DHS) if she has concerns about what is happening with children under her care.  Amanda testified that she did not contact

9

DHS regarding Anna and Sarah.

¶29. Amanda testified that at an individualized education program (IEP) meeting she attended with Bryan, along with an administrator, a speech therapist, an occupational therapist, and a general education teacher, Bryan made a comment suggesting that the school staff in attendance presently had vodka, and not water, in their cups. Amanda also testified when Bryan dropped the girls off at school, she has heard loud music playing in his vehicle, which Amanda agreed would be a stimulation for Anna and Sarah. Amanda testified that Stacy has also dropped off Anna and Sarah at school.

¶30. The chancellor next heard from Michele Samuels, an autism teacher and Applied Behavior Analysis (ABA) therapist hired by Sherry to work with Anna and Sarah while they lived in Virginia. Michele testified that she met with Anna and Sarah after school. Michele stated that in September 2015, she began working with the girls twice a week. Michele testified that insurance paid for her services for approximately a year, and then Sherry and David paid her "out of their . . . private pocket" to work with the girls as an in-home tutor. Michele stated that Sherry "was very involved" in Michele's treatment with the girls.

¶31. Michele described Anna as possessing language-development ability, but she explained that Anna "didn't use a lot of language to communicate. She did a lot of verbal stem scripting. She would remember movies and videos and she would recite things over and over again. It was kind of hard to engage her in conversation." Regarding Anna's behavioral issues, Michele testified that she "had a little bit of aggression. [Anna] was aggressive with me . . . [and] with her sister. Getting her to do things was difficult . . . a lot of

10

noncompliance. If you asked her to do things, she would wander away or she would sit on the floor." Anna also tended to "bolt," or run off.

¶32. Michele testified that she worked with Anna on "answering questions" and explained that "if I asked her things, you know, like [what did] you have for dinner, or [what did] you have for lunch, she would properly answer me versus just scripting or talking about something that she was pretending, because she has a pretty good imagination."

¶33. Michele explained when she initially began working with the girls, she performed a functional life-skills assessment on Anna, which revealed that Anna "wasn't doing things that a normal child of her age would be doing." As a result, Michele worked with Anna on "washing her face, brushing her teeth, chores, cleaning the table, picking up your toys, making a bed, sweeping the floor, those kinds of things."

¶34. Michele testified that during her time working with Anna, Anna "started to use a lot more language, and she seemed to engage more with activities." Michele explained that Anna "liked to do a lot of solitary play, so she would play more with me. She would ask more questions. She was using language more appropriately, not just kind of scripting or singing or—she became a little more social. She would seek out others to interact with." Michele also testified that Anna's problem with bolting "went away for a while."

¶35. As far as her work with Sarah, Michele stated that for the first month or two, Sarah "didn't really want to do anything, so we had a lot of what we would say temper tantrums, a lot of laying on the floor, a lot of screaming, a lot of crying. She didn't want to come to the table. She didn't really want to interact with me." Michele also testified that when she first

11

began working with Sarah, Sarah was not potty trained, and so she worked with her on getting her out of pull-ups and into underwear. Michele stated that Sarah also had a problem with spitting, explaining that if she would work with Sarah for an hour, there would be approximately fifteen to twenty spitting episodes during that time.

¶36. Michele testified that during her work with Anna and Sarah, they met many goals and "were using language a lot more appropriately." She eventually began working with the girls on more academic-type activities as well.

¶37. When asked by Sherry's counsel if Michele was ever concerned about whether Sherry was properly engaged with the children's care and therapy, Michele answered: "Never." Regarding Anna's and Sarah's hygiene, Michele testified: "They were clean. We always . . . worked on them washing their face by themselves and doing things by themselves, but they were clean." Michele stated that she never witnessed Sherry discouraging the girls from becoming independent.

¶38. Clara Ash testified next. Clara worked as an assistant teacher for children with autism in Virginia, and she testified that she taught Anna for one school year and Sarah for two school years.

¶39. Clara testified that when Anna first came to her classroom "she was delightful," explaining that "there were never any behavior problems. There wasn't a lot of language, a lot of meaningful language, from either one of them initially, but we were able to address all of the objectives and the goals on the IEP with them. They made a great deal of progress."

¶40. Clara testified that Sarah utilized a feeding tube for nutrition and that Clara personally participated in feeding Sarah formula by using the tube. Clara testified that during Sarah's first year at school, Sarah would vomit after receiving a feeding approximately once every few weeks but that "there was no regularity in that." Clara stated that Sarah did not vomit after feedings during her second year in school. Clara described Sarah as "very happy, content, willing to learn." During her testimony, Clara expressed that "children with autism thrive with consistency."

¶41. Clara testified that she interacted with Sherry "every single morning and every single afternoon when she would bring [Anna and Sarah] or pick them up." Clara stated that "it was like a [brief] teacher conference" because "we told her every day how the children did." Clara testified that "[t]he discussion was always about the children and Sherry wanting to know how their day was and if we needed anything and if they needed anything."

¶42. Sherry's counsel then called Bryan to testify as an adverse witness. Bryan testified that when he and Sherry were in court finalizing their Marital Dissolution Agreement, she informed him that "she was leaving to [move] to [Washington,] D.C. to live her dream." Bryan stated that Sherry moved that same day, and approximately a week and half later, he and the girls moved to Monroe. Bryan explained that his stepmother and sister were both special needs teachers and willing to help Bryan care for Anna and Sarah.

¶43. Bryan testified that he worked as a cover package car driver for UPS and was stationed in the Jackson, Mississippi metro area. Bryan stated that although he lived in Monroe, he still worked in Jackson, explaining: "You can't transfer being a package car

13

driver for UPS. It's pretty much impossible, unless you know somebody." Bryan spoke to his boss about the possibility of a transfer, but he was unable to transfer his job to full time work in Monroe.

¶44. Bryan testified that in the May 2015 agreed order of visitation, Sherry was awarded summer visitation with Anna and Sarah from May 13, 2015, until August 7, 2015. As far as Sherry and Bryan eventually deciding that the girls would remain in Virginia with Sherry, Bryan testified as follows:

> We talked about it, and before we agreed to anything I said I had to fly up there, look at the . . . living situation that she lived in. I had to meet with the school, which I did go to the school, met with the principal—I think it was assistant principal I met with—and a bunch of other teachers about the curriculum. And I visited Sherry's house, saw they had their own bedroom, and . . . that's when we decided in Virginia, you know, maybe—she said she straightened up and she's willing to step up, you know, and do the right thing. So I was like we'll go along and see how it works out. She promised to keep them in therapy and all that kind of stuff. And we were doing this as parents—we were looking for the best interest of the girls[.]

Bryan testified that he and Sherry also discussed sharing joint physical custody of the girls.

¶45. Bryan testified that after Anna and Sarah moved to Virginia, he left Monroe and moved back to Clinton to avoid the two-hour commute each way. Bryan stated that he initially moved into a friend's house in Clinton. Bryan expressed that when he first moved, he felt like a temporary residence would be best in case it did not work out for the girls to remain with Sherry in Virginia and he needed to move back to Monroe with them. Bryan also testified that he and Sherry discussed the possibility of him moving to Washington, D.C. in order for the two of them to raise Anna and Sarah together. Bryan said that he went to Washington, D.C. and visited, but he discovered that he could not transfer his job, so he gave

14

up on the idea. In January 2017, Bryan moved into a house with his girlfriend, Stacy.

¶46. Bryan said that the first year the girls lived in Virginia, he "visited a lot." During direct examination, he stated that he did not have any specific recollection of any specific visit from August 2016 until July 2017. However, Bryan testified that he took Anna and Sarah to Destin, Florida four times during the time they lived in Virginia. Bryan testified that in July 2017, he went to Virginia and spent two full days and one night with Anna and Sarah.

¶47. Bryan stated that he and Sherry had discussed venting Sarah before and after feeding her through the feeding tube. Bryan acknowledged that Sherry "always says" to vent Sarah before feeding her. Bryan testified that he "never vented [Sarah] . . . in her life," that he did not think she needed to be vented, and "there was never a doctor['s] order to vent her."

¶48. Bryan also testified during his July 2017 visit with the girls in Virginia, he took the girls shopping and bought them toys and two pet fish. Sherry's counsel introduced a photograph into evidence, which Bryan confirmed was a picture of the things he purchased for the girls on the shopping trip. This photograph does not appear in the record on appeal.

¶49. Bryan also testified about an incident that occurred during the July 2017 visit. According to Bryan, prior to meeting Sherry to return the girls to her, Anna and Sarah screamed and begged for thirty minutes to stay with him. Bryan testified that "[w]hen [Anna] saw David and Sherry pull up . . . [Anna] got out of the vehicle and ran down the street away from her mother, to get away from her mother. I had to chase her down and bring her back, and she was squirming not to go to her mother." Bryan stated that he asked Sherry what was going on and asked why Anna was screaming. Bryan explained, "I was very upset

15

at the time because my girls were screaming."  Bryan stated that as follows:

> David decided he wanted to approach me, said, I'm going to take care of this. And I met him around the corner.  I asked him what is he going to do, and I confronted him.  He ran and got a cop.  I told the cop what was going on.  The cop did nothing to me, so—and I asked Sherry what was going on and I think that—I can't remember if that's when she admitted the girls hadn't been in therapy for a while, even though she told me they had been in therapy, said she was paying for it.  Then I found out they weren't.  That's what she said, so—I finally ask, What's going on up here?  Are the girls being neglected, abused? What is going on up here? What is David doing?  What are you doing?  Why are they screaming?  Why are they running from you?  And I knew then that something was wrong in D.C., and that's why I was like -- my flight was leaving out, and I said, all right, we go to the beach in a few weeks.  Let me see what's going on.  Sherry kept denying everything again.

Sherry's counsel asked Bryan if Bryan thought it was possible that "the fact that [he] hadn't seen [his] daughters in nearly a year and the fact that [he] just bought them a carload full of toys" had any impact on the way they were acting, as far as wanting to stay with him longer. Bryan answered: "No, ma'am."

¶50.    Bryan testified that when he and the girls arrived in Destin in September 2017, Anna and Sarah "began begging me to stay with me more; and I said, That's it.  You're not going back to your mama's house.  Something's going on up there and I've got to find out what it is.  I have no way to find out because, I mean, I don't live in Virginia, [and] she [doesn't] live down here."  Bryan also testified that this September 2017 trip was the first time Stacy had met Anna and Sarah.

¶51.    As far as supporting the girls, Bryan testified: "I bought every toy they have pretty much:  Their swing set.  I bought their gaming station.  I buy everything they got.  I buy all their food and everything[.]"

16

¶52.  Bryan testified that after he moved out of Stacy's house, he hired a nanny to help with the girls.  When asked the nanny's name, he said he could not recall the nanny's last name, but that he had known her for years.

¶53.  Regarding Sarah's ability to eat, Bryan testified that doctors at Blair E. Batson Children's Hospital performed tests on Sarah's stomach and the doctors "said she was perfectly normal. There's nothing wrong with her.  Nothing in her testing.  There's nothing wrong with her stomach."  Bryan also stated that Sarah "is very capable of eating.  She's never been told she couldn't eat, and she's eaten in front of me.  She's even walked by the lunchroom at the school and said, Yummy, pointed to the cafeteria when she smelled the food."  Bryan acknowledged that Sarah does not receive formula at school, and he explained that Sarah gets out of school at 1:30 p.m. and that he feeds her at 1:45 p.m.  Bryan testified: "[A]s soon as she gets home every single day, that's the first thing she does.  She eats one fry.  Kids don't have to eat every four hours.  A lot of kids go longer. [Anna] goes longer than that to eat sometimes because she's not hungry."

¶54.  Sherry's counsel asked Bryan if it would surprise him to know that Sarah did not gain weight from July 2014, when the divorce was final, through May 2015—during which time Sarah lived with Bryan in Monroe.  Bryan responded that during that time period he did not increase the amount of formula Sarah received, explaining: "The doctors write how much formula she gets a day, and you don't go every single week to get that done.  You have to go to a specialist to get that done.  She was going to see a specialist.  The specialist never did increase it."  Bryan testified that when Anna and Sarah moved to Virginia in May 2015, he

17

asked Sherry to check on getting Sarah more formula.

¶55. Sherry's husband, David Page, testified next. David testified that he and Sherry had been married for three years, and for just under two and a half of those years, Anna and Sarah lived with them. David stated that his thirteen-year-old daughter Kayley also lived with them. David testified that he and Sherry live in a five-bedroom house, and that Anna and Sarah each had their own bedroom.

¶56. David described his version of the incident that occurred on July 21, 2017, at the time that Bryan dropped off Anna and Sarah with Sherry after his visit to D.C. David described Bryan's behavior at that time as "volatile," explaining that he was using foul language in front of Anna and Sarah.

¶57. Finally, Sherry testified before the trial court. Sherry testified that Anna and Sarah moved to Virginia to live with her in May 2015 because "Bryan had lost his support system, his family. He was moving back to Mississippi, was what I understood, and he lost his support network and couldn't do it on his own."

¶58. Sherry testified that from April 2014 through May 2015, Sarah weighed 33 pounds. Sherry testified that she was alarmed that Sarah's weight did not change while she was in Bryan's care. Sherry testified that after speaking with a pediatrician, she gradually increased Sarah's daily caloric intake. According to Sherry, Sarah weighed 55 pounds in August 2017. As for Sarah's feeding tube, Sherry explained that venting the tube was important because venting "relieves the pressure in her stomach and allows her to feel comfortable enough not to throw up her calories."

18

¶59. At the close of Sherry's case-in-chief, Bryan moved to dismiss the case, arguing that Sherry bore the burden to show a "material change in the circumstances adverse to these children in the custodial parent's home or something that's going on in the children's life that's adverse to them" and that she failed to make such a showing. Sherry argued, however, that she had met her burden of proving a material change of circumstances and provided as follows:

> The testimony bore out that [Bryan] no longer has that support system available to him. In fact, [Bryan], when he did get the children back with him after allowing them to be gone for two and a half years, he moved in with a woman that he was not married to, whom the children had only known for a few days at best, who had never met the children of the woman that he moved in with, then put them in another school. Then within a week, ten days, maybe two weeks of that moved to a different house, had a different woman taking care of the children, to which he couldn't think of her last name for quite awhile, and then he now is going to be putting them in yet another school as of tomorrow. Not to mention, the teacher that came in to testify that since they've been back in his custody they've come to school without proper attire, without proper grooming, and have had issues in the classroom that concerned her as to whether or not they were being properly cared for. So as to meeting the burden that there's been a change in his household, there's been lots of changes, even since we were here the last time in court.

¶60. After hearing arguments from the parties, the chancellor granted Bryan's motion to dismiss. The chancellor explained his ruling as follows:

> The circumstances that were existing at the time of the divorce with regard to these children are very similar to what's existing today, and it's a very tragic situation: that both of these little girls are autistic. They're special needs children, and especially with regard to [Sarah] and her eating problems or eating disorder or eating dysfunction or whatever one would choose to call it, but that circumstance was existing then and it's existing today. There's been no change there.
> [Bryan] had these children for almost a year and then he allowed them to go and live with their mother, but [Sherry] didn't do anything about trying to change custody, and so that fact is really – other than him allowing them to

19

live there doesn't affect the custody order. The Order that's sought to be changed is the one that was entered in 2014.

And, likewise, . . . [Sherry] came down here in September after [Bryan] had retrieved the children and had elected to keep them pursuant to the custody order that was in effect and begged him to agree to change it or begged him to agree to modify it and he wouldn't do it, and so she left and went back to Virginia and her life there and left the children here with him. And there's been no testimony that these children are being abused or neglected or -- or in any way harmed or that anything has happened to them while they've been here in his custody, either before the voluntary election for them to go to Virginia or since they have returned to his rightful custody. Because until the custody order is changed, either through an agreement of the parties or through a contested decision by this court, the custody order that's in effect is the one that was rendered in 2014.

And I do not find that there has been a substantial and material change in circumstances adverse to the welfare of these children in their present situation. Very little to me has changed since this custody order was entered into. And so I have to make that finding before I can conduct an *Albright* analysis to determine a change of custody. I do not make that finding; and so because I am unable to make that finding, the motion to dismiss be and same is hereby granted.

After the chancellor stated his ruling from the bench, the following exchange occurred

between the chancellor and Sherry's attorney:

| [ATTORNEY]: | Your Honor, to clarify for the record, it's this court's ruling that Mr. Graves moving in with someone to who he's not married with -- married to[.] |
|---|---|
| THE COURT: | Well, he's not living there now. |
| [ATTORNEY]: | And immediately moving again and moving these girls' school again and showing complete instability and having no one to help him care for these children, even someone that he doesn't know their last name, a teacher that testified that the kids were unkempt, to have lost and found coats because -- and were getting no sleep -- under his care, the court finds that that doesn't even constitute a change in circumstances? |
| THE COURT: | Well, those -- those things are things that were thrown |

20

out, but the court does not believe that those are substantial and material changes adverse to their welfare that would justify a change of custody. The court -- he has hired a nanny -- Mr. Graves has hired a nanny to help him with these children. Mrs. Page hired a nanny to help her keep them during the summer when she had them. I don't see what the difference is. These children are special needs children and they need help and assistance, and both of these parties have reached out to other people to help them with these children. The teacher said that one day they came to school and a cold snap had occurred and they didn't have proper coats and they found some to borrow from lost and found, and there was never any other episode or instance discussed about them not having proper clothing.

[ATTORNEY]:     She said several times she had to reach out, was her exact testimony.

THE COURT:      Well, I don't recall that, but even so I don't think that's -- the controlling fact or the controlling idea is that she did not -- if a teacher had thought that these children were so neglected or abused that a material change of circumstances adverse to their welfare had occurred, she didn't do anything about it. She didn't call DHS. She didn't report it to anybody, and so therefore, you know, I have to accept -- the actions speak louder than words; and she didn't take any action to do anything to rectify what she would have -- if she perceived it to be such an adverse situation, she didn't do anything to cause DHS to become involved.

[ATTORNEY]:     Your Honor, DHS . . . requires abuse, and a material change in circumstances does not require abuse. It's a completely different standard.

THE COURT:      It does not require abuse necessarily, but it requires adverse effect; and these children are in the same boat today they were in when these parties got the divorce.

[ATTORNEY]:     Except now they're in a very unstable, moving environment. Continuously moving. They're going to

change schools again tomorrow.

THE COURT:          Well, they would have to change schools again tomorrow
                    if they go back to this lady.

[ATTORNEY]:         To go back to where they have been for two and a half
                    years.

THE COURT:          . . . I've already made the ruling and the ruling stands,
                    and that's the ruling and judgment of the court.

¶61.    As stated, Sherry filed a motion for reconsideration, the chancellor held a hearing on

the motion on December 13, 2017. The chancellor ultimately denied Sherry's motion and

held as follows:

> The problem is [that Sherry's] home was not the custodial home, [Bryan's
> home] was; and so whatever happened in [Sherry's] home is really immaterial
> to whether or not a material change of circumstances occurred, because
> [Bryan], for whatever reason, allowed these children to remain with her. But
> when he determined that things were happening in Virginia that were not in
> their best interests and he was the custodial parent, he came and got them back.
> And so for those reasons and for the reasons that the court explained in its
> initial opinion, the motion for reconsideration be and same is hereby denied.

¶62.    After reviewing the evidence and testimony presented, we now turn to discuss whether

Sherry met her burden of proving by a preponderance of evidence that a material, adverse

change in circumstances occurred.[3] The first factor we examine is whether a material change

of circumstances has occurred in the custodial home since the most recent custody decree.

In the present case, the original custody decree (the July 24, 2014 judgment of divorce that

incorporated the Marital Dissolution Agreement) set forth that Bryan would have legal and

---

[3] In her reply brief, Sherry points out that Bryan's pro se appellate brief contains no
citations to the record. Mississippi Rule of Appellate Procedure 28(f) provides that "All
briefs shall be keyed by reference to page numbers (1) to the record excerpts filed pursuant
to Rule 30 of these Rules, and (2) to the record itself."

physical custody of Anna and Sarah, subject to Sherry's reasonable visitation. The Agreement also anticipated that Anna and Sarah would reside in Monroe. In May 2015, Sherry and Bryan agreed to modify the original visitation order to allow Sherry to have unsupervised visitation with Anna and Sarah and to provide Sherry with three months of summer visitation with the girls. The May 2015 order stipulated that "Bryan shall continue to have physical and legal custody of the minor children."

¶63. The record reflects that although Anna and Sarah did live with Bryan in Monroe for almost a year, they moved to Virginia and lived with Sherry and David for over two years. During the two years that Anna and Sarah lived in Virginia, Bryan visited them occasionally and took them on vacations. In September 2017, Bryan moved the girls from Virginia to live with him and Stacy in Clinton. The record shows that Anna and Sarah met Stacy for the first time the same month they moved in to live with her. Bryan also enrolled the girls in school in Clinton. One month later, Bryan moved Anna and Sarah out of Stacy's house and into an apartment and enrolled them in a new school. These facts, when viewed in the totality of the circumstances, reflect a substantial deviation from the original custody order.

¶64. "[T]his Court has found that [even] a short move can . . . result in a material change in circumstances." *Pearson v. Pearson*, 11 So. 3d 178, 182 (¶9) (Miss. Ct. App. 2009) (citing *Rinehart v. Barnes*, 819 So. 2d 564 (Miss. Ct. App. 2002) (father moved from DeSoto County, Mississippi to Cordova, Tennessee); *Massey v. Huggins*, 799 So. 2d 902 (Miss. Ct. App. 2001) (couple resided in Laurel, Mississippi during the marriage; mother moved to Forrest County, Mississippi then to Petal, Mississippi; father moved to Natchez, Mississippi,

23

then to Long Beach, Mississippi)). However, we recognize that "[t]he distance of the move is not dispositive as to whether a material change in circumstances has occurred; it is the effect the move has on the child and the custody arrangement that is dispositive." *Id*. at (¶10); *see also Powell*, 976 So. 2d at 362 (¶16) ("[R]elocation of the custodial parent does not alone constitute a material change in circumstances."). We recognize that "a material change in circumstances may be established where a custodial parent's relocation is one of several supporting factors." *Powell*, 976 So. 2d at 362 (¶16).

¶65. In *Brocato v. Brocato*, 731 So. 2d 1138, 1141 (¶10) (Miss. 1999), the Mississippi Supreme Court held that the custodial father's decision to send his son to live with relatives amounted to a material change in circumstances. The chancellor recognized that the father "had voluntarily and independently relieved himself of responsibility over" his son. *Id*. Based in part on that finding, the supreme court "agree[d] that a material change in circumstances in the custodial home has been shown by a preponderance of the evidence." *Id*. The supreme court conducted an *Albright* analysis and determined that the child's bests interests were served by modifying custody to the mother. *Id*. at 1143-44 (¶26).

¶66. In *Powell v. Powell*, 976 So. 2d 358, 360 (¶3) (Miss. Ct. App. 2008), the chancellor awarded Richard and Amy joint legal custody of their four minor children, with Amy to have physical custody subject to Richard's reasonable visitation rights. Richard filed a petition for modification of child custody. *Id*. at (¶7). After a trial on the matter, the chancellor denied Richard's motion for modification of custody after determining "that there had been no material change in circumstances adverse to the children." *Id*. at 361 (¶9). On appeal, this

24

Court found that "the chancellor failed to consider the totality of the circumstances to determine whether a material change of circumstances had occurred" and accordingly reversed the chancellor's judgment finding that no material change in circumstances had occurred. *Id*. at 362 (¶17). In so doing, this Court held that the chancellor failed to give due consideration to the following "significant factors": "at the time of trial, the children had been enrolled in three different schools over the past five years"; Amy's living situation with her boyfriend was unstable; "the children testified regarding the difficulties they experienced in adjusting to their ever-changing educational and social environments"; one of the children was raped, and Amy was reluctant to provide the child with professional counseling. *Id*. This Court also held that "the chancellor failed to consider the negative effects of the unstable environment created by Amy's nomadic relocation and sporadic employment. Amy's intermittent employment resulted in an unstable home environment for the children." *Id*. On remand in *Powell*, this Court instructed the chancellor to give due consideration to the facts. *Id*. at 362 (¶18).

¶67. After our review of the testimony and evidence presented at trial, we find that Sherry presented sufficient evidence on this factor to survive Bryan's motion to dismiss and the involuntary dismissal at the close of her case-in-chief.

¶68. We next turn to examine whether Sherry presented sufficient evidence showing that this change adversely affected Anna and Sarah. In *Gainey*, 24 So. 3d at 336 (¶10), this Court recognized that "only parental behavior that poses a clear danger to the child's mental or emotional health can justify a custody change." However, this Court acknowledged that in

25

*Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996), the supreme court explained as follows:

> when the environment provided by the custodial parent is found to be adverse to the child's best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly. This must be so, for "in all child custody cases, the polestar consideration is the best interest of the child."

(Citations omitted). The *Riley* Court further clarified that "where a child living in a custodial environment clearly adverse to the child's best interest, somehow appears to remain unscarred by his or her surroundings, the chancellor is not precluded from removing the child for placement in a healthier environment." *Id*.

¶69. Our review of the testimony from Anna and Sarah's teachers in Mississippi and Virginia showed that the girls do not adjust well to change, due in large part to their autism. Amanda, Anna and Sarah's teacher in Clinton, testified that during her time as the girls' teacher, she contacted both Bryan and Stacy "several, several times" regarding her concerns about the girls' hygiene and clothing. Amanda explained that when the weather turned cold, the girls did not have coats or long pants, but she admitted that eventually the girls did wear appropriate attire. Amanda also testified that she observed times where the girls arrived at school without brushing their hair or their teeth, and she recalled two days where Sarah arrived at school and appeared very exhausted. However, Amanda testified that her concerns did not rise to a level where she felt the need to contact DHS.

¶70. As far as their hygiene while in Sherry's care, Anna and Sarah's teacher in Virginia, testified that Sherry was extremely involved in Anna and Sarah's progress. Michele, the girls' therapist and tutor, testified that Sherry was very involved in the girls' treatment and

26

observed that Anna and Sarah were always clean.

¶71. Sherry also testified that while Sarah was in Bryan's care from April 2014 through May 2015, Sarah weighed 33 pounds. Sherry testified that she consulted a pediatrician and increased Sarah's caloric intake; as a result, Sarah weighed 55 pounds in August 2017. Sherry also expressed concern that Bryan refused to vent Sarah's feeding tube, explaining that venting "relieves the pressure in her stomach and allows her to feel comfortable enough not to throw up her calories." Bryan testified, however, that he, too, was concerned about Sarah's failure to gain weight, and asked Sherry to check on increasing Sarah's caloric intake. Bryan explained that while Sarah was in his care, she saw a specialist regarding her nutrition, and that specialist never increased the amount of formula Sarah should receive.

¶72. In *Hall v. Hall*, 134 So. 3d 822, 826 (¶12) (Miss. Ct. App. 2014), this Court affirmed the chancellor's finding "that a substantial and material change in circumstances had occurred since the time of the original custody decree" where the custodial parent: (1) failed to provide one child with adequate dental care and (2) failed to notify the other parent when another child suffered a significant dog bite and also failed to seek care for the bite injury from a medical professional.

¶73. In *Stark v. Anderson*, 748 So. 2d 838, 843 (¶9) (Miss. Ct. App. 1999), this Court affirmed the chancellor's judgment that a material change in circumstances occurred where the mother neglected some of the child's needs and failed to provide a stable environment for the child. The parties in that case, David and Wendy, were married and had one child. *Id.* at 840 (¶2). After David and Wendy divorced, the chancellor granted Wendy custody of

27

their six-month old son, and David received reasonable visitation rights. *Id*. Both David and Wendy eventually remarried. *Id*.

¶74. Approximately three years after obtaining their divorce, David filed a petition for modification of child custody in which he argued that "substantial and material changes had occurred because Wendy had neglected some of the child's needs and had failed to provide a stable environment for the child." *Id*. at (¶3). Following a trial on the matter, the chancellor held that a material change in circumstances occurred and awarded custody to David. *Id*. The chancellor set forth the following findings in support of his judgment:

> The [c]ourt finds that other than [David,] the entire immediate and extended family of the minor child . . . are residents of Jackson County, Mississippi, that the child has been cared for extensively by [David] since birth and that a close and substantial bond has been established and exists between the child and [David], and further finds that substantial material changes in circumstances adverse to the child have occurred while the child was with [Wendy] since the entry of the Judgment of Divorce herein and that it is the best interest and welfare of the minor child . . . . based upon the totality of the circumstances that custody of said minor be transferred from his mother, [Wendy], to his father, [David].

*Id*. at 842 (¶9). The chancellor also incorporated into the judgment David's proposed findings of fact and conclusions of law. The conclusions of law included several factors that had adversely affected the child and also several factors that favored a change in custody:

> The following factors relative to the mother have negatively impacted the child: (1) cohabitation of the mother outside of marriage, (2) the excessive drinking of alcohol by the stepfather, (3) the manic depressive diagnosis and conduct of the mother, (4) the inappropriate disciplining of the child by the stepfather, (5) the lies of the mother about material issues, (6) the poor relation of the child with the stepfather, and (7) the frequent moves of the mother.
>
> Further the following factors relative to the father favor a change in custody: (1) the father and the child have a close, loving relationship and have had

regular frequent visitation, (2) the stepmother has been and is supportive of the father-son relationship, (3) the stepmother's close, loving relationship with the child, (4) the suitability of the home environment of the father, and (5) the totality of the circumstances regarding the father and the child.

*Id*. at 842-43 (¶9). Upon review, this Court ultimately held that "[a]fter reviewing the record and the findings of fact and conclusions of law, we cannot say that the chancellor manifestly erred in his decision" that a material change in circumstances occurred. *Id*. at 843 (¶9).

¶75. Additionally, as stated, the material change in circumstances must have been "unforeseeable at the time of the original [custody] decree." *Giannaris*, 960 So. 2d at 469 (¶12). Sherry argues here that the changes in the custodial home were unforeseeable. Sherry submits that when the chancellor made the initial custody award, the parties anticipated that Anna and Sarah would reside in Monroe, where Bryan had his support system in place, including his stepmother and sister who are both special-needs teachers. Sherry asserts that many changes have occurred since the original custody decree, many of which she and Bryan did not foresee.

¶76. We review a chancellor's decision to grant a Rule 41(b) dismissal in a modification of child custody action "under the deferential substantial-evidence/manifest-error standard." *Shows*, 238 So. 3d at 1232 (¶33). The chancellor in the present case was charged with determining whether a material change in circumstances occurred, which requires a consideration of the totality of the circumstances. *See Gainey*, 24 So. 3d at 336 (¶11). Our review of the record reflects that given the totality of the circumstances, Sherry presented sufficient evidence of a material change in circumstances adverse to Anna and Sarah to survive the Rule 41(b) dismissal. As stated, the standard for granting a Rule 41(b) dismissal

29

is "if, after viewing the evidence *fairly*, rather than in the light most favorable to the plaintiff, the judge would find for the defendant." *All Types Truck Sales Inc.*, 178 So. 3d at 758 (¶13) (internal quotation marks omitted). Since Sherry presented sufficient evidence to survive a motion to dismiss at trial, we reverse the chancellor's judgment of dismissal and remand this case with instructions for the chancellor to allow the trial to proceed. If, after completion of the trial and after giving due consideration to the totality of the circumstances, the chancellor finds an adverse material change, "the next step is to apply the *Albright* factors to determine whether modification is in the child[ren]'s best interest." *White v. White*, 26 So. 3d 342, 351 (¶28) (Miss. 2010).

¶77. **REVERSED AND REMANDED.**

**GREENLEE, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., AND J. WILSON, P.J.**

**WESTBROOKS, J., DISSENTING:**

¶78. I am of the opinion that the chancellor did not err in dismissing Sherry's motion for remodification and respectfully dissent. In *Lewis v. Lewis*, 974 So. 2d 265, 267 (Miss. Ct. App. 2008) (citations omitted), the Court held:

> In a case disputing child custody, the chancellor's findings will not be reversed unless manifestly wrong, clearly erroneous, or the proper legal standard was not applied. The burden of proof is on the movant to show by a preponderance of the evidence that a material change in circumstances has occurred in the custodial home.
>
> In the ordinary modification proceeding, the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody.

In considering whether there has been such a change in circumstances, the totality of the circumstances should be considered. Even though under the totality of the circumstances a change has occurred, the court must separately and affirmatively determine that this change is one which adversely affects the children.

Furthermore, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child.

. . . .

Before custody should be changed, the chancellor should find that the overall circumstances in which a child lives have materially changed and are likely to remain materially changed. . . ."

¶79. Sherry's petition for modification primarily centers around the time Anna and Sarah lived with her.[4] During the bench trial, both Bryan and Sherry testified that they agreed that the girls would stay in Virginia with Sherry. Bryan agreed to the move only if Anna and Sarah's accustomed living situation, which included therapy and a proper school, would continue. The move benefitted both parents; it gave Sherry the opportunity to be near and re-connect with the girls, and it afforded Bryan the flexibility he needed to meet the obligations of his job at UPS. Bryan testified that he was in school in Monroe and that he also commuted to UPS in Jackson (which was a two hour drive). He moved from Monroe to be closer to his job after failed attempts to have his employment transferred to Monroe. The separation from his step-mother and sister was not derelict but ultimately freed him to have more time to raise Anna and Sarah.

¶80. Testimony at trial also evinced that Anna and Sarah experienced certain challenges

---

[4] "Traditionally, Mississippi law has held that [] 'a change in the circumstances of the non-custodial parent does not, by itself, merit a modification of custody.'" *Lewis*, 974 So. 2d at 267 (¶15).

while in both Bryan and Sherry's custody. Sherry testified that when Sarah came to live with her, Sarah's gaunt appearance disturbed her. Bryan also testified that when he visited Anna and Sarah, they acted scared as though they were afraid. The chancellor, however, explained that both little girls are autistic and that the girls would experience and have to overcome certain challenges no matter who was given parental custody.

¶81. Sherry presented testimony suggesting that Bryan neglected the girls while they were in his care. Amanda Langford, the girls' special education teacher testified that she contacted Bryan and Stacy several times regarding the problems with the girls' hygiene and clothing. However, Langford never contacted DHS as required if she had serious concerns about the children. Moreover, she did not express that either Anna or Sarah exhibited any behavioral issues that were atypical for autistic children. She also testified that during a cold snap there was an instance the girls were inappropriately dressed at school. The problem was eventually cured after Langford spoke with Bryan. This Court has held that "isolated incidents" do not typically justify a modification of custody. *Shows*, 238 So. 3d at 1233 (¶36) (Miss. Ct. App. 2018). Further, Langford testified that there was never a time when she was concerned about the girls while they were in Bryan's care. A material change must present a genuine danger to the child.[5]

¶82. At the close of Sherry's case-in-chief, Bryan moved to dismiss the case. After hearing the arguments from both parties, the chancellor granted Bryan's motion. "In a bench trial, a judge ruling on a motion for involuntary dismissal under Rule 41(b) must consider the

---

[5] Deborah H. Bell, *Bell on Mississippi Family Law* § 12.11[5][a], at 396 (2d ed. 2011).

32

evidence fairly, rather than in the light most favorable to the plaintiff." *Shows v. Cross*, 238 So. 3d 1224, 1232 (¶33) (Miss. Ct. App. 2018). "If the judge would find for the defendant, the case should be dismissed." *Id*. Further, "[t]he judge should deny a Rule 41(b) motion *only* if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." *Id*. (Emphasis added).

¶83. I do disagree with the chancellor's statement that during the time Sherry had the children she did not attempt to change custody. The record undisputedly showed that the chancellor questioned Sherry about how she was able to enroll the children in school when Bryan had sole legal and physical custody. Sherry responded that, with Bryan's consent, she tried to change to joint custody in Virginia, but the court rejected the "paperwork" because it did not have jurisdiction over Bryan. Sherry admittedly never followed up and pursued the modification in Virginia. Nor did she file a request for modification in Mississippi while the girls lived with her in Virginia.[6]

¶84. This Court has affirmed a chancellor's denial of a modification of custody, even after the chancellor was submitted evidence from the child's father regarding the child's tooth decay, the mother's relationship history, allegations that the mother gave the child a powerful anti-psychotic drug, and allegations that the mother caused the child stress by refusing to let the father exercise his visitation rights. *Sudduth v. Mowdy*, 991 So. 2d 1241, 1244 (¶¶9-14) (Miss. Ct. App. 2008).

¶85. Under the original custody order, Sherry was awarded supervised visitation. In May

---

[6] Other than Sherry's undisputed testimony, there was no Virginia court filing requesting modification of custody in the record.

2015, Bryan entered into an agreed order with Sherry allowing her unsupervised visitation for an extended time period. The girls lived with Sherry for approximately two years, and she and Bryan agreed that Anna and Sarah would stay with her indefinitely. However, she did not successfully petition a Virginia or Mississippi court to modify the order. Also, during the time that the girls were living with Sherry, Bryan continued to visit the children and support them financially. Bryan testified that only after witnessing the girls were irate, screaming and apprehensive about going back into their mother's care, did he decide custody should continue with him. He cited Sherry's husband as a cause for concern. This incident led to Sherry admitting to Bryan that the girls had not been in therapy for a while under her care.

¶86. The majority opinion reverses on the premise that the chancellor did not consider other factors that materially changed Bryan's circumstances and highlights the facts supporting the decisions in *Borcato* and *Powell*. Unlike the father in *Borcato*, Bryan did not "reliev[e] himself of responsibility" over Sarah and Anna; he continued to support his daughters financially and visited them throughout their stay in Virginia. *Brocato*, 731 So. 2d at 1141 (¶10). While the girls' extended visitation with Sherry did allow Bryan more flexibility with work, Sherry benefitted as well. Sherry was allowed to spend time with and strengthen the bond between her and her daughters, as requested. In *Powell*, there were egregious circumstances surrounding the court's findings of adverse change. The mother, Amy, was sporadically employed and resided in an unstable residence with her boyfriend and minor children. *Powell*, 976 So. 2d at 360 (¶17). While in her custody, one of Amy's minor

34

children was raped near the boyfriend's home, and Amy was reluctant to provide counseling for the child. *Id.* The majority also cites *Riley*, where the Court found the custodial environment, where the child's mother and stepfather tested positive for illicit drugs, was clearly adverse to the child. *Riley*, 677 So. 2d at 744. Here, no substantial evidence was presented by Sherry to demonstrate that Bryan posed a danger to the children's mental or emotional health, and no illegal behavior was alleged.

¶87. While the girls were in Bryan's custody, Bryan had them in therapy and attending special education classes. After the short time that the girls were back in Bryan's care, he had already enrolled them in school. It was only after Bryan retrieved the girls and positioned them back in his care, that Sherry sought to modify custody.

¶88. Sherry tried to characterize Bryan as an unstable father who constantly moved from one location to another. But Bryan explained that after the girls began staying with Sherry, he temporarily moved into a friend's house in Clinton, which was closer to UPS. Bryan also testified that he contemplated moving to Washington, D.C. to co-parent with Sherry until he discovered that he could not transfer his job. In September 2017, Bryan testified that after he noticed Anna and Sarah appeared scared of Sherry and her husband, he moved the girls from Virginia to live with him and Stacy in Clinton. Shortly thereafter, Bryan moved the girls from Stacy's home to an apartment and enrolled them into a new school. The appellate courts have repeatedly held that "the mere moving of one party or the other is insufficient grounds for modification of child custody." *Lambert v. Lambert*, 872 So. 2d 679, 685 (¶24) (Miss. Ct. App. 2003). "Opportunity and economic necessity transport perfectly responsible

adults many miles from their homes." *Id*. (citing *Spain v. Holland*, 483 So. 2d 318, 321 (Miss.1986)). In addition, at the time of the hearing the chancellor acknowledged that Bryan no longer cohabitated with Stacy, which remedied any material change.

¶89. The chancellor ruled that the same circumstances existing at the time of the divorce with regard to the children are very similar to what existed at the time of the modification hearing. He found that there was no testimony that the girls were being abused, harmed or neglected while in the custody of Bryan. Last, the chancellor also acknowledged that Bryan retrieved Anna and Sarah and elected to keep them pursuant to the custody order that was already in effect.

¶90. As an appellate court, "we may not substitute our judgment for the chancellor's but must determine if the chancellor's ruling is supported by substantial evidence." *Norman v. Norman*, 962 So. 2d 718, 721 (¶10) (Miss. Ct. App. 2007) (citing *Bower v. Bower*, 758 So. 2d 405, 412 (¶33) (Miss. 2000)). Accordingly, I would affirm the chancellor's decision to dismiss Sherry's motion for modification of child custody.

¶91. Therefore, I respectfully dissent.

**BARNES, C.J., AND J. WILSON, P.J., JOIN THIS OPINION.**