# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-01235-COA

**GREGORY SHOWS**                                                      **APPELLANT**

**v.**

**HOPE SHOWS CROSS**                                                   **APPELLEE**

DATE OF JUDGMENT:              02/24/2016
TRIAL JUDGE:                  HON. T. K. MOFFETT
COURT FROM WHICH APPEALED:    MONROE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       KURT AUGUST MORD
ATTORNEY FOR APPELLEE:        HOPE SHOWS CROSS (PRO SE)
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED - 02/27/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE LEE, C.J., WILSON AND WESTBROOKS, JJ.

### WILSON, J., FOR THE COURT:

¶1.     Greg Shows and Hope Shows Cross divorced in February 2007. The divorce decree awarded Hope physical custody of the couple's only child, S.S.[1]  In December 2011, Greg filed a petition to modify custody. A hearing on the petition was held over the course of four days in 2012, 2015, and 2016. After Greg presented his case, the chancellor dismissed his petition to modify custody, finding that he had failed to meet his burden of proving a material change in circumstances that adversely affected S.S. On appeal, Greg challenges that ruling as well as the chancellor's rulings on issues of child support, contempt, and the

---

[1] We use the minor child's initials because the case involves allegations of abuse, albeit unproven allegations.

apportionment of the fees of the guardian ad litem (GAL). For the reasons discussed below, we find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Greg and Hope married in July 2005; their son, S.S., was born in March 2006; they separated in May 2006; and the chancery court entered a final judgment of divorce based on irreconcilable differences in February 2007.

¶3. The divorce decree adopted and incorporated the parties' custody and property settlement agreement. The parties agreed to joint legal custody of S.S. with Hope to have "primary physical custody."[2] Greg was granted visitation, including alternating weekends, four weeks in the summer, spring break, and certain holidays. The agreement also required Greg to pay child support as follows:

> 1. The parties agree that [Greg] will pay, as and for support of [S.S], the monthly amount of $200.00 . . . .
>
> 2. Additionally, as and for further monthly child support, [Greg] shall pay one-half of day-care for [S.S.] per month or $135.00, whichever is greater. When [Greg] pays the current monthly support amount of $200.00 he shall also pay his portion of the day-care expenses, as stated herein, for the preceding month, so that when the $200.00 for February [2007] is paid by [Greg], his portion of the January [2007] day-care expenses shall be added and paid at that time, and likewise for every month.

¶4. In December 2011, Greg filed a petition for modification of custody seeking "primary

---

[2] "Although it is a phrase commonly used by lawyers and judges, there is actually no provision under the statute for 'primary' physical custody." *Rush v. Rush*, 932 So. 2d 794, 796 (¶9) (Miss. 2006) (citing Miss. Code Ann. § 93-5-24 (Rev. 2004)). "[W]ith regard to physical custody, [the statute] only provides for joint physical custody, and physical custody in one parent or another." *McSwain v. McSwain*, 943 So. 2d 1288, 1290 n.2 (Miss. 2006). As in this case, the phrase "primary physical custody" is often meant to describe physical custody in one parent, with the other having specified visitation rights.

physical custody" of S.S. Greg alleged that Hope had remarried and had "allow[ed] both her new husband, as well as [her] children by a previous marriage, to emotionally and verbally abuse [S.S.]" Greg also alleged that Hope "herself had verbally abused [S.S.]" Greg's petition requested appointment of a GAL for S.S.

¶5. Hope answered Greg's petition and also filed a petition for contempt and a counter-complaint to modify or clarify the visitation provisions of the parties' agreement. Hope alleged that Greg had violated the agreement's child support and visitation provisions. Hope denied that a GAL was necessary, but the chancellor subsequently appointed attorney Jonathan Martin as GAL for S.S.

¶6. The hearing on Greg's petition and Hope's petition and counter-complaint was held on October 30, 2012; July 16, 2015; and February 17 and 24, 2016. Chancellor Talmadge Littlejohn presided over the first two days of the hearing; however, Chancellor Littlejohn passed away in October 2015. The case was then reassigned to Chancellor T.K. Moffett, who presided over the final two days of the hearing.

¶7. On the first day of the hearing, Greg testified that he was living in Senatobia with his new wife, Kip, and a stepdaughter, who was then seven years old. Greg was unemployed at the time, as he had recently closed a used car lot and was still collecting on some car notes. Kip was employed as a sales manager for a company that sells shipping containers.

¶8. Greg alleged that Hope had refused to allow him to have scheduled weekend visitation with S.S. three times between 2008 and 2010. He also alleged that seven to ten times he had to ask the sheriff's department to accompany him to pick up S.S. for visitation. Greg claimed

3

that he needed the sheriff's department's help because Hope had threatened that her new husband, Kenny, would "kick [his] A." Greg also testified that Hope interfered with his phone calls with S.S. by requiring S.S. to talk to him on speaker and then eaves-dropping on their conversations. Greg testified that he could hear cursing and threats in the background when he talked to S.S. on the phone. Greg claimed that S.S. was "withdrawn" when Greg picked him up at Hope's house, that his demeanor improved while he was with Greg, and that S.S. became upset and cried when he had to go back to Hope's house.

¶9.    Greg testified that in 2011 he became concerned about S.S.'s "withdrawn" and "defiant" behavior. Without consulting Hope, Greg took S.S. to a licensed professional counselor, Tajuana Williams, in September 2011. Williams testified that when she began counseling S.S., who was then five years old, she was concerned that he exhibited symptoms of depression, that he reported hearing a lot of profanity at his mother's house, and that he described Hope as "mean." S.S. also told Williams that his stepfather, Kenny, "had wiped poop on his face"; however, after questioning S.S. further, Williams could not determine what he meant or what exactly happened. Hope told Williams that S.S. simply had misunderstood a bad "joke." Williams initially "had concerns of neglect, verbal abuse, and possible physical abuse." Prior to one session, Greg told Williams that S.S. had slapped his stepsister at Greg's house, and when Williams discussed the incident with S.S., he told her that step-siblings at Hope's house had slapped him. This concerned Williams, but she testified that the incidents "could also be just children playing."

¶10.    On cross-examination, Williams testified that she ultimately found no evidence of

4

physical abuse, even after follow-up medical examinations by physicians. In addition, after Williams reported her initial concerns to the Department of Human Services (DHS), DHS investigated and found no evidence of physical abuse. Williams opined that some of the incidents that S.S. described to her constituted "emotional maltreatment," but she was unwilling to use the term "emotional abuse." Williams also acknowledged that she had never seen S.S. interact with Hope or Kenny, so she had only seen "one side of the picture." Williams also testified that S.S.'s initial complaints that Hope was "mean" were non-specific, and in later sessions S.S. told her that Hope was "being nice."

¶11. Williams stopped counseling S.S. in May 2012 because he was "happy" and "healthy" and no longer exhibited symptoms of anxiety or depression. Williams confirmed that S.S. was doing well in school and had not had any disciplinary problems. The hearing recessed at the conclusion of Williams's testimony.

¶12. As noted above, the hearing recessed for about thirty-two months between the first and second days of testimony. In the interim, lawyers on both sides withdrew, new lawyers entered appearances, and there were a number of continuances, most of which Greg requested.

¶13. In addition, on July 31, 2013, Greg filed an emergency motion for temporary custody in which he alleged: (a) that S.S. was undergoing counseling and that his counselor had advised it was not in his best interest to be returned to Hope's custody and (b) that S.S. had been "diagnosed . . . with ulcers associated with the fear of returning to [Hope's] home and other related matters." Hope denied Greg's allegations and filed a petition for contempt

5

based on Greg's failure to return S.S. to her. Based on the GAL's recommendation, the chancellor found that returning S.S. to Hope's custody pending a final hearing on the merits would not result in any irreparable harm to S.S. The chancellor therefore denied Greg's emergency motion for custody.

¶14. Before the hearing resumed, Greg also filed a motion to allow S.S. to testify and for an "in camera *Jethrow* examination" of S.S.[3] The hearing finally resumed on July 16, 2015, with Greg still on direct examination.[4]

¶15. Greg testified that in June 2013 his family and Hope's family both attended a baseball game of S.S.'s in Amory. Greg claimed that after the game Hope approached him and Kip and began "mouthing and saying stuff to us." According to Greg, Hope and her sister then "attacked" him and his sister. Greg testified that S.S. witnessed part of the altercation and was "very shook up and scared" by it. The three women were all arrested and released after posting cash bonds.

¶16. About two weeks later, there was another incident at a baseball game in Pascagoula. According to Greg, after the game, Hope "grabbed [S.S.'s] arm and yanked him up away from [Greg]," while "yelling and screaming at [Greg]." Greg claimed that Hope "threw [S.S.] over her shoulder, and turned and started walking out of the ballfield, spanking [S.S.] while [he was] kicking and screaming and crying not wanting to go." Greg testified that he filed his emergency motion for custody based in part on these two incidents.

---

[3] *See Jethrow v. Jethrow*, 571 So. 2d 270, 273-74 (Miss. 1990).

[4] Greg's testimony was interrupted on the first day of the hearing to allow Williams to testify out of order.

¶17. Greg testified that after his emergency motion for temporary custody was denied in August 2013, S.S. was upset about having to return to Hope's custody. Greg also complained that Hope had continued to interfere with his phone conversations with S.S. since the first day of the hearing. The court recessed the hearing at the end of the day on July 16, 2015, with Greg still testifying. The hearing was continued until February 17, 2016.

¶18. On January 19, 2016, Greg filed a motion for contempt, alleging that Hope had denied him visitation the weekend before Thanksgiving in 2015. The docket indicates that Hope filed a response, although it is not included in the record.

¶19. The hearing resumed on February 17, 2016, before Chancellor Moffett. As noted above, the case was reassigned to Chancellor Moffett after Chancellor Littlejohn's death in October 2015, and the parties agreed that Chancellor Moffett could read and consider the testimony already given during the first two days of the hearing. On February 18, 2016, the court granted Greg's request for a *Jethrow* examination of S.S. When the hearing continued on February 24, 2016, the chancellor conducted an in camera *Jethrow* examination and ruled that S.S. was competent to testify, although he was still too young for the chancellor to consider his preference, if any, regarding custody. S.S. testified in chambers with only the chancellor, the court reporter, the GAL, and the parties' attorneys present.

¶20. At the time of his testimony, S.S. was in fourth grade and almost ten years old. He lived with Hope, Kenny, two half-brothers (then ages twenty-four and twenty-two), and a half-sister (then age seventeen). The family lived next door to his grandmother, who operated a daycare out of her home. S.S. testified that he made all As in school except for

7

a B in math, which was consistent with report cards admitted into evidence.

¶21.    S.S. testified that he had heard profanity at both of his parents' homes but more often at Hope's home.  S.S. testified about an incident in which his aunt (Hope's sister) fought with his cousin's wife, and the fight escalated to the point that one woman pointed a shotgun at the other, but no shots were fired.  This incident occurred sometime in the spring of 2015, and Hope was not present.  S.S. also testified that he had heard Hope and Kenny disparage Greg and even say that "they would like to kill [Greg]"; however, S.S. knew that Hope and Kenny were not actually going to kill Greg.

¶22.    S.S. testified that the previous summer he had gone to Georgia for two weeks for family gatherings with Hope's family.  At a family shrimp and crab boil, his grandfather (Hope's father) gave him a Budweiser, and he "tasted some . . . but it was nasty."  S.S. testified that Hope saw his grandfather give him the Budweiser.  S.S. also testified that Hope and Kenny allowed his then-sixteen-year-old half-sister to have a Michelob Ultra, and "[s]he drank half of it."  That was the only time he had ever seen his half-sister drink alcohol.  He had witnessed Greg, Kip, Hope, and Kenny all drink beer or wine, but he testified that none of them drank frequently, and he had never seen any of them drunk.

¶23.    S.S. testified that Hope loses her temper about once or twice a month, and he is "afraid" when that happens.  However, he also testified that Hope regularly helps him with his homework and teaches his Wednesday night class at church.  S.S. testified that both of his parents were "responsible" and that he got along with both of them well and "[a]bout the same."  When the chancellor asked S.S. whether either Greg or Hope could do anything to

8

make his life better or easier, his only comment was that they could both quit smoking.

¶24. Following S.S.'s in-chambers testimony, Greg's testimony continued. Greg testified that Hope had continued to interfere with his phone calls with S.S. He also testified that he was working in auto sales on a commission-only basis, that his gross income for 2015 was about $29,000, and that he expected his income to decrease in 2016.

¶25. The GAL reported that he did not believe that S.S. was in any danger with either Hope or Greg. In addition, based on his investigation, which included home visits and interviews with S.S., the GAL did not find that there had been any material change in circumstances since the divorce that adversely affected S.S. Therefore, the GAL did not recommend a modification of custody.

¶26. Greg's attorney then stated that he rested his case, subject to his right to cross-examine Hope during her case. Hope then moved to dismiss Greg's petition to modify custody because Greg had not proven any material change in circumstances. Greg's attorney objected that he should be allowed to cross-examine Hope before the chancellor ruled. At that point, the chancellor questioned Greg as to what material changes in circumstances he alleged. Greg testified that he considered increased "violence" and cursing and interference with his relationship with S.S. to be material changes in circumstances that had adversely affected S.S. physically (alleged stomach problems) and emotionally.

¶27. The chancellor then directed Hope to testify. The chancellor questioned Hope about issues raised in S.S.'s testimony and about Greg's allegations. The chancellor also allowed Greg's attorney to cross-examine Hope. Hope admitted that she had used profanity in front

of S.S. Hope testified that she did not know that S.S. had sipped a beer in Georgia. Hope claimed that Greg's family had attacked her in Amory and that she only defended herself. She referred to that incident as "the most embarrassing moment of [her] life." Hope denied that she had interfered with Greg's relationship with S.S. She also denied that S.S. had stomach ulcers; she testified that S.S. did not take any medicine for ulcers and that his primary treating physician told her that he did not have ulcers.

¶28. Following Hope's testimony, the chancellor announced his rulings from the bench. First, the chancellor found that Greg had not met his burden of proving a material, adverse change of circumstances. Therefore, he dismissed Greg's petition to modify custody. Next, the chancellor ruled that the parties' original custody and property settlement agreement, which the divorce decree incorporated and adopted, required Greg to pay minimum child support of $335 per month, not $200 per month as Greg contended. *See supra* ¶3. Greg challenges this ruling on appeal, and we discuss the issue in more detail below. In addition, the chancellor ruled that Greg's child support obligation would be modified prospectively based on Greg's current adjusted gross income. The chancellor also ordered that Greg would pay the remaining balance of the GAL's fees. The chancellor also found that Greg was in contempt for failing to return S.S. following visitation in July 2013 but that Hope was not in contempt for denying Greg visitation in November 2015. However, the chancellor denied both parties' requests for attorney's fees. Finally, the chancellor modified Greg's visitation schedule to, inter alia, grant significant additional summer visitation.

¶29. The chancellor subsequently entered a final judgment based on his bench rulings. The

10

judgment allowed Greg 120 days to pay his child support arrearage, which the chancellor found to be $7,695. The judgment also ordered Greg to pay the GAL's final bill within 120 days. The judgment modified child support prospectively to $326 per month. The chancellor sentenced Greg to seven days in jail for contempt but suspended the sentence conditioned upon Greg's compliance with future court orders. Again, both parties' requests for attorney's fees were denied.

¶30. Greg filed a notice of appeal. On appeal, Greg argues that the chancellor erred by: (1) dismissing his petition to modify custody; (2) finding that the original divorce decree required him to pay minimum child support of $335 per month; (3) modifying child support prospectively; (4) finding him in contempt; (5) not finding Hope in contempt; and (6) requiring him to pay the fees of the GAL. Hope failed to file a brief on appeal, her former attorney informed the Court that she no longer represents Hope, and Hope then informed the Court by letter that she did not intend to file an appellate brief.

**ANALYSIS**

### I. Standard of Review

¶31. In general, when the appellee fails to file a brief,

> this Court has two options. First, we may take the appellee's failure to file a brief as a confession of error and reverse. This option is favored when the record is complicated or of large volume and the case has been thoroughly briefed by the appellant with apt and applicable citation of authority so that the brief makes out an apparent case of error. However, if the record can be conveniently examined and such examination reveals a sound and unmistakable basis or ground upon which the judgment may be safely affirmed, we may disregard the appellee's error and affirm.

*Patrick v. Patrick*, 204 So. 3d 854, 857 (¶10) (Miss. Ct. App. 2016) (quoting *Jay Foster*

11

*PLLC v. McNair*, 175 So. 3d 565, 571 (¶15) (Miss. Ct. App. 2015)). Moreover, "when 'child custody is at issue, this Court is compelled to review the record, despite [the appellee's] failure to file a brief.'" *Vassar v. Vassar*, 228 So. 3d 367, 374 (¶22) (Miss. Ct. App. 2017) (quoting *Muhammad v. Muhammad*, 622 So. 2d 1239, 1243 (Miss. 1993)).

¶32. "This Court does not sit to redetermine questions of fact." *Century 21 Deep S. Props., Ltd. v. Corson*, 612 So. 2d 359, 367 (Miss. 1992). Therefore, "[a] chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous." *Sanderson v. Sanderson*, 824 So. 2d 623, 625 (¶8) (Miss. 2002). "Legal questions, however, are reviewed de novo." *Sanford v. Sanford*, 124 So. 3d 647, 652-53 (¶21) (Miss. 2013).

¶33. At the conclusion of Greg's case in chief, the chancellor dismissed Greg's petition to modify custody pursuant to Mississippi Rule of Civil Procedure 41(b)[5] because Greg failed to prove a material change in circumstances that adversely affected S.S. In a bench trial, a judge ruling on a motion for involuntary dismissal under Rule 41(b) "must consider the evidence fairly, rather than in the light most favorable to the plaintiff." *Corson*, 612 So. 2d at 369. If the judge "would find for the defendant, the case should be dismissed." *Id.* The judge should deny a Rule 41(b) motion "only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." *Id.* "This Court applies the substantial evidence/manifest error standards to an appeal of a grant or denial of a motion to dismiss pursuant to [Rule] 41(b)." *Id.*

---

[5] "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." M.R.C.P. 41(b).

## II. Petition to Modify Custody

¶34. "To obtain a change in custody, the moving party must prove by a preponderance of the evidence that (1) a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) the change adversely affects the child, and (3) the child's best interests mandate a change in custody." *Butler v. Butler*, 218 So. 3d 759, 762 (¶11) (Miss. Ct. App. 2017). "To determine whether a material change in circumstances has occurred, the court must consider the 'totality of the circumstances.'" *Id.* (quoting *Moreland v. Spears*, 187 So. 3d 661, 664 (¶6) (Miss. Ct. App. 2016)). The chancellor does not conduct an *Albright*[6] analysis unless he first finds that there has been a material change in circumstances that adversely affects the child. *Strait v. Lorenz*, 155 So. 3d 197, 203 (¶20) (Miss. Ct. App. 2015) (citing *White v. White*, 26 So. 3d 342, 351 (¶28) (Miss. 2010)).

¶35. On appeal, Greg contends that the chancellor should have found a material change in circumstances. Greg relies primarily on evidence that S.S. sipped a Budweiser in Hope's presence at a family gathering. Greg also cites evidence that Hope and others cursed and disparaged him in S.S.'s presence and interfered with his visitation. Greg also alleges that Hope has "inflicted" "emotional abuse . . . on [S.S.]," including by "losing her temper." Finally, Greg cites the two incidents at baseball games in the summer of 2013.

¶36. We cannot say that the chancellor erred in finding that Greg failed to meet his burden of proving a material change in circumstances that adversely affected S.S. Hope testified that she did not know that S.S.'s grandfather had given him a beer in Georgia. Moreover, S.S.

---

[6] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

concluded on his own that the beer "was nasty," and there is no evidence that Hope allowed S.S. to drink beer on any other occasion. Without condoning or minimizing any consumption of alcohol by minors, there is no evidence that this single incident had any adverse effect on S.S. *See Touchstone v. Touchstone*, 682 So. 2d 374, 378-79 (Miss. 1996) (explaining that "isolated incidents" do not typically justify a modification of custody).

¶37. In addition, we cannot say that the chancellor clearly erred by finding that Hope's temper, profanity, and the incidents at baseball games in 2013 were not material changes in circumstances that adversely affected S.S. The evidence in this case, which spanned several years, showed that S.S. continued to perform well in school, was in good physical and mental health, and had good relationships with both of his parents. Hope also denied that she had interfered with Greg's visitation or relationship with S.S., and even accepting Greg's allegations as true, Greg did not establish interference so severe as to constitute a material change in circumstances. *See Mixon v. Sharp*, 853 So. 2d 834, 838 (¶10) (Miss. Ct. App. 2003) ("Changing child custody is not an appropriate punishment for [a refusal to allow visitation]."). Accordingly, we find no error in the chancellor's dismissal of Greg's petition to modify custody.

### III. Child Support

¶38. As discussed above, the parties' custody and property settlement agreement, which their final judgment of divorce adopted and incorporated by reference, required Greg to pay child support as follows:

> 1. The parties agree that [Greg] will pay, as and for support of [S.S.], the monthly amount of $200.00 . . . .

14

2. Additionally, as and for further monthly child support, [Greg] shall pay one-half of day-care for [S.S.] per month or $135.00, whichever is greater. When [Greg] pays the current monthly support amount of $200.00 he shall also pay his portion of the day-care expenses, as stated herein, for the preceding month, so that when the $200.00 for February [2007] is paid by [Greg], his portion of the January [2007] day-care expenses shall be added and paid at that time, and likewise for every month.

¶39. Greg argues that his obligation under the second quoted provision was *only* to pay for daycare expenses actually incurred. Thus, he argues that he was obligated to pay only $200 per month once S.S. was no longer in daycare. However, the chancellor ruled that the plain language of the second provision required Greg to pay a minimum of $135 per month ($335 total) even if no daycare expenses were incurred.

¶40. We hold that the chancellor correctly interpreted the parties' agreement. The plain language of the second provision states that Greg "shall pay one-half of day-care for [S.S.] per month or $135.00, *whichever is greater*." (emphasis added). Thus, the provision unambiguously required Greg to pay an additional $135 per month even if S.S.'s daycare expenses were less than that amount or even $0. This provision was not conditioned on S.S.'s enrollment in daycare, nor did it limit Greg's additional support obligation to the amount of S.S.'s actual daycare expenses. Accordingly, Greg's argument on this issue is without merit. *See In re Dissolution of Marriage of Hanlin*, 164 So. 3d 445, 448, 451 (¶¶7, 20) (Miss. 2015) (holding that a property settlement agreement is a contract and that it must be enforced as written if it is not ambiguous); *Short v. Short*, 131 So. 3d 1149, 1152 (¶¶9-10) (Miss. 2014) (holding that parties may agree on the amount of child support and, provided the amount is sufficient to support the child, their agreement will be enforced).

15

¶41. Greg also argues that the chancellor erred by modifying his child support obligation prospectively because there was no proof of a material change of circumstances. Going forward, the chancellor ordered Greg to pay fourteen percent of his current adjusted gross income ($326 per month). The chancellor also ordered that Greg would pay only half that amount ($163 per month) in June and July of each year based on Greg's increased summer visitation. Greg's challenge to the modification is premised on his belief that the chancellor increased his support obligation. However, as discussed just above, the parties' original agreement required Greg to pay a minimum of $335 per month. Thus, the chancellor's ruling actually *reduced* Greg's support obligation. Because Greg is not aggrieved by the reduction of his support obligation, he lacks standing to raise the issue on appeal. *See Patrick v. Boyd*, 198 So. 3d 436, 445-46 (¶¶32-33) (Miss. Ct. App. 2016).

### IV. Contempt

¶42. Next, Greg contends that the chancellor erred by holding him in contempt for failing to return S.S. from summer visitation in July 2013 and by not holding Hope in contempt for denying him visitation in November 2015. We find no error in the chancellor's rulings.

¶43. "Whether a party is in contempt is a question of fact to be decided on a case-by-case basis. A chancellor has substantial discretion in deciding contempt matters because of the chancellor's 'temporal and visual proximity' to the litigants." *Gilliland v. Gilliland*, 984 So. 2d 364, 369-70 (¶19) (Miss. Ct. App. 2008).

¶44. Greg did not deny that he deliberately refused to return S.S. from visitation in July 2013, and the GAL and Chancellor Littlejohn found no merit in Greg's claim that S.S. would

16

be harmed if he was returned to Hope's custody. Therefore, the chancellor did not err in finding that Greg had violated the custody provisions of the divorce decree and was in contempt.

¶45. Hope testified that she denied Greg visitation the weekend before Thanksgiving in 2015 because she thought that Greg's Thanksgiving holiday visitation "supersede[d]" his regular weekend visitation. Chancellor Moffett declined to find Hope in contempt, noting that Chancellor Littlejohn previously had ordered the parties to confer and make adjustments to their holiday visitation schedules, which left the issue somewhat unsettled. On these facts, we cannot say that Chancellor Moffett clearly erred or abused his discretion.[7]

## V.    GAL Fees

¶46. Finally, Greg argues that the chancellor erred by ordering him to pay the GAL's final bill[8] because his initial allegation of abuse was supported by Williams's testimony. However, we find no error in the chancellor's apportionment of the GAL fees.

¶47. "Our rules of procedure treat guardian ad litem fees as court costs to be awarded against the non-prevailing party." *McCraw v. Buchanan*, 10 So. 3d 979, 985 (¶20) (Miss. Ct. App. 2009) (quoting *Miss. Dep't of Human Servs. v. Murr*, 797 So. 2d 818, 821 (¶9) (Miss. 2000)); *see* M.R.C.P. 17(d). "This Court has held that chancellors possess large

---

[7] We note that Chancellor Moffett similarly declined to find Greg in contempt for failing to pay the disputed $135 per month in child support. We also note that although he found Greg in contempt, the chancellor denied Hope's request for attorney's fees.

[8] Chancellor Littlejohn's August 2013 order denying Greg's emergency motion for temporary custody ordered each party to pay $1,500 to compensate the GAL for services rendered to that point in the case.

discretion in apportioning costs," including the costs of the GAL. *Darby v. Combs*, 229 So. 3d 136, 146 (¶35) (Miss. Ct. App. 2016) (citing *McCraw*, 10 So. 3d at 985 (¶35)), *aff'd*, 229 So. 3d 108 (Miss. 2017). "If upon review this Court finds that 'the decree apportioning the costs [of the GAL] works a manifest injustice on any of the parties, the decree will be reversed.'" *Id.* (quoting *McCraw*, 10 So. 3d at 985 (¶21)).

¶48. We find no abuse of discretion or manifest injustice in the chancellor's ruling on the GAL's fees. Greg requested the appointment of a GAL and specifically alleged that Hope, Kenny, and S.S.'s step-siblings had abused S.S. Hope denied Greg's allegations and also denied that a GAL was necessary. The GAL found no evidence of abuse, and Williams agreed that there was no evidence of physical abuse. Although Williams opined that some of Hope's alleged conduct constituted "emotional maltreatment," even Williams was unwilling to use the term "abuse." Moreover, the chancellor ultimately found that Greg failed to meet his burden of proving even a material change in circumstances. On these facts, Greg has not shown that the chancellor's ruling "works a manifest injustice." *See Darby*, 229 So. 3d at 146 (¶35). Therefore, we cannot say that the chancellor abused his "large discretion" by requiring Greg to pay the GAL's final bill. *Id.*

## CONCLUSION

¶49. We find no error in the chancellor's rulings on custody, child support, contempt, and payment of the fees of the GAL.

¶50. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**