# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01182-COA

**PATRICK AARON WALL**                                                                 **APPELLANT**

**v.**

**ROBIN RENE MAY WALL**                                                                  **APPELLEE**

DATE OF JUDGMENT:               10/16/2020
TRIAL JUDGE:                    HON. TROY FARRELL ODOM
COURT FROM WHICH APPEALED:      RANKIN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         CHRISTOPHER A. TABB
ATTORNEY FOR APPELLEE:          JOHN DAVID SANFORD
NATURE OF THE CASE:             CIVIL - DOMESTIC RELATIONS
DISPOSITION:                    AFFIRMED - 03/22/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Patrick Aaron Wall appeals the involuntary dismissal of his petition for child custody

modification by the Rankin County Chancery Court.  *See* M.R.C.P. 41(b).  Patrick asserts

that the chancellor failed to apply the proper legal standard by not considering the totality of

the circumstances as required in custody modification cases.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Patrick and Robin May Wall were married in 2008.  The couple had one son born of

the marriage in 2009, J.W.[1]  In September 2017, the Rankin County Chancery Court entered

a final judgment of divorce between Patrick and Robin on the ground of irreconcilable

---

[1] We use initials to protect the privacy of the minor child.

differences. An approved separation agreement was incorporated into the final judgment of divorce, awarding joint legal custody of J.W. to both parties but granting physical custody to Robin alone. The separation agreement also contained a detailed visitation schedule that divided the holidays and summers between both parties and allowed Patrick visitation with J.W. every other weekend.

¶3. In September 2018, Patrick filed a petition for civil and criminal contempt against Robin, asserting that she failed to allow Patrick visitation. Robin filed a counterclaim seeking sole legal custody. The chancery court determined that Robin was not in contempt for failing to allow Patrick visitation. The court found that the failed visit was a one-time incident, and it was not willful, intentional, or part of a pattern. The chancery court also reaffirmed its prior custody decision, stating that it was not in the child's best interest to change legal custody as Robin requested in her counterclaim. The judgment continued by ordering both parties to refrain from harassing, threatening, or disparaging the other in the presence of J.W. and on social media.

¶4. Approximately two years later, in September 2020, Patrick filed a petition for modification of custody of J.W. Patrick asserted in his petition that there were two material changes in circumstance that were adverse to J.W.: (1) J.W. had missed school and accumulated numerous early check-outs and tardies, and (2) Robin's new boyfriend Marcus Ivey was a convicted sex offender listed on the Mississippi Sex Offender Registry but was allowed to spend the night at her residence despite her knowledge of his status. At the hearing, Patrick presented numerous additional examples as material changes in

circumstances that adversely affected J.W. Patrick alleged that Robin had (1) admitted to smoking marijuana at a party, (2) purchased and used alcohol in front of J.W., (3) lost her job, (4) left J.W. alone at the home at night when she went out with friends, and (5) maintained a tasteless Tiktok account that J.W. had access to; Patrick further alleged that J.W. had (6) discussed his desire to self-harm on a video game messaging app. At the close of testimony, Robin made a Rule 41(b) motion to dismiss on the ground that Patrick had failed to put forth the requisite evidence to show that any of Robin's actions had an adverse effect on J.W.

¶5. The chancellor dealt with each of these allegations in turn in his findings. The chancellor prefaced his findings by reminding all parties of the requirement of considering the totality of the circumstances when determining whether there had been a material change in the custodial home. The chancellor first dispensed with the allegations that did not cause him concern. The chancellor initially assessed whether Robin's association with Ivey negatively impacted J.W. Robin testified she had severed her connection with Ivey, whom she had only dated briefly, and since J.W. had little to say about Ivey during his testimony, other than that he had not seen him in over a month, the chancellor determined that there was a lack of evidence of any negative impact on J.W. from this association. The chancellor also pointed out that "[custody] modification[s] should not be ordered if a material adverse changes had been remedied[,] . . . [a]nd the best evidence indicates that it has."

¶6. The chancellor found that testimony about Robin taking "one puff" of a marijuana joint six months prior to the hearing did not constitute a material change, stating the court

3

was "in no position to take somebody's child away from them for one puff six months ago." Likewise, the chancellor quickly dismissed Patrick's allegation that a material change occurred when Robin lost her job, pointing to Robin's testimony that she had lost her job the prior week but was scheduled to start another one the next day.

¶7.     The remaining issues were of more concern to the chancellor and were discussed in greater detail. First, the chancellor expressed great concern over the high number of tardies, checkouts, and absences that school records showed J.W. had accrued during the 2019 and 2020 school years. During J.W.'s 2019 school year, he was tardy thirty-two days and absent eighteen. And for the 2020 school year, as of the date of the hearing in October 2020, J.W. had already accumulated five absences and one tardy. There was testimony from Patrick that due to the excessive absences, J.W.'s grades had fallen from As and Bs to As, Bs, and two Cs. While admonishing Robin for the excessive absences, the chancellor pointed out that J.W.'s and Robin's testimony established some valid reasons for J.W.'s absence: J.W. was kept out of school after his grandfather had a stroke, after the death of his dog, and when he was kept home with fevers as a precaution during the COVID-19 pandemic. The chancellor also noted that J.W.'s grades were actually "not bad for a child of [a] recent divorce whose parents are constantly in court since . . . divorc[ing] and who has had to deal with an unprecedented global pandemic that canceled school . . . last year." Additionally, earlier testimony from Patrick established that J.W. had made Cs in the past, demonstrating the two Cs for the 2019-2020 year were not an anomaly. The chancellor pointed to testimony from Patrick and Robin that they both appropriately disciplined J.W. when he received bad grades

4

and that he received assistance from his mother, father, and mom's roommate Danielle with his schoolwork.

¶8.    The chancellor next assessed the assertion that J.W. was frequently left at home alone, including overnight.  Robin's testimony established that she had left him at home alone or with her roommate's younger children on multiple occasions at night while she socialized with friends, her boyfriend, or at various times went to a pool hall, a bar, or Daiquiri World in Louisiana.  However, testimony by J.W. and Robin established that Robin lived on family land, "in a little triangle" of family homes that included Robin's father, sister, and grandmother, all whom J.W. guessed were located anywhere from six to fifty feet from his house.  Robin testified that if she was not at home, he would be checked on by her grandmother or father, or he would walk over to their houses to stay until she returned.  She noted that "all the kids come and go" and are always supervised by one of the family members.  Additionally, J.W. testified that Robin's roommate Danielle supervised him at other times when his mother had to run errands.  While the chancellor expressed his displeasure at the lack of direct supervision at times, he noted that there was "[v]ery little reliable evidence introduced indicating that J.W. was completely unsupervised," as J.W. and Robin lived so close to extended family members.

¶9.    The chancellor continued by addressing the statements regarding J.W.'s expressed desire to self-harm.  During his testimony Patrick briefly referred to an earlier expression regarding self-harm that J.W. had made by text after his parents' divorce.  He mentioned that during that time, J.W. saw a therapist to help him deal with the effects of the divorce.  Patrick

elaborated more on a second instance of J.W. expressing a desire to self-harm, which was made using the messaging function of an Xbox video game. Patrick testified that after he discovered the message, J.W.'s Xbox was taken away. Robin and Patrick discussed their concerns and enrolled J.W. in therapy sessions, which J.W. was still attending at the time of the hearing. The chancellor acknowledged in his findings that J.W.'s statements were concerning but reasoned:

> There's no reliable testimony as to the first incident, an apparent text to his mother, as to when it occurred, and possibly could have occurred prior to the divorce or when the divorce was going on. The second incident, a message made through an online Xbox game to a third party, occurred more recently. No one can testify . . . as to when [J.W.] actually sent the message, where he was, or why. What we do know is that when Patrick discovered it, Patrick took the gaming system away . . . and Robin changed the settings on [J.W.]'s phone and gaming system so that messaging with . . . third parties were -- those options were deleted. Patrick and Robin discussed the situation together and [J.W.] began seeing a counselor . . . so that he could talk about it.

¶10. The chancellor continued his findings by declaring that he found J.W. during his testimony to be an engaging and pleasant young man who did not appear depressed, but the chancellor believed J.W. was engaging in attention-seeking behaviors common of children from recently divorced families.

¶11. Finally, the chancellor touched on Robin's allegedly inappropriate social media presence on accounts to which J.W. had access. J.W. testified to seeing TikTok videos of his mother holding alcohol and using profanity. During the hearing, several of Robin's TikTok videos were viewed in which she had joked about topics such as homeschooling J.W. and drinking. The chancellor chastised Robin for these posts, noting they display a "complete lack of maturity and discretion," which only mattered to the court because J.W.

6

had access to the content and was smart enough to continue to find ways to access posts even if she set her social media accounts to private. While the chancellor noted Patrick's opposition to J.W.'s TikTok use, he observed that J.W. testified Patrick's other children used TikTok in Patrick's house, apparently without censure.

¶12. After separately discussing each issue, the chancellor again referenced his obligation to view the totality of circumstances but noted it did not appear to him that a material change in circumstances had occurred in the custodial home. The chancellor next addressed whether any adverse effects on J.W. were apparent, stating:

> Even if [these issues] constituted a material change, there is no evidence the material change caused an adverse effect on [J.W.]. The most concerning information, that being [J.W.'s] self-harm indication, we have no idea what caused it. There is no connection between that message and a material change that has occurred in Robin's home. It's far more likely that the message was sent as a result of his parents divorcing and was a method of coping with that divorce.

The chancellor continued by remarking that J.W.'s grades were acceptable and that both parents appropriately disciplined him when his grades were not acceptable. The chancellor also mentioned that

> [J.W.] is active in football and baseball. He has a loving family on both sides. He is polite. . . . He's intelligent, well-adjusted. As far as what this Court could see on his testimony on the stand, he enjoys living with his mother. He's a good kid and - - and it's good that he's seeing a counselor. But this Court cannot find any adverse effect on the child directly related to any material change in circumstances in the custodial home.

¶13. The chancellor then reminded the parties that our Supreme Court disfavors custody modifications because they are traumatic experiences for children, and the chancellor concluded by dismissing Patrick's petition to modify custody pursuant to Robin's Rule 41(b)

motion. The chancellor's final judgment and order of dismissal issued in October 2020 dismissed Patrick's petition with prejudice. Shortly thereafter, Patrick filed his notice of appeal.

## STANDARD OF REVIEW

¶14. "In cases involving child-custody modification, this Court will not disturb the findings of the chancellor unless the chancellor was manifestly wrong, was clearly erroneous, or applied an erroneous legal standard." *Bryant v. Bryant*, 105 So. 3d 1146, 1149 (¶13) (Miss. Ct. App. 2012) (citing *White v. White*, 26 So. 3d 342, 346 (¶10) (Miss. 2010)). "[W]e will not reverse where the chancellor's findings are supported by substantial credible evidence." *Jones v. Jones*, 878 So. 2d 1061, 1064 (¶4) (Miss. Ct. App. 2004). On appeal, we review a chancellor's decision to grant a Rule 41(b) dismissal in a modification-of-child-custody action "under the deferential substantial-evidence/manifest-error standard." *Page v. Graves*, 283 So. 3d 269, 274 (¶22) (Miss. Ct. App. 2019) (quoting *Shows v. Cross*, 238 So. 3d 1224, 1232 (¶33) (Miss. Ct. App. 2018)). "Under this standard, we must affirm unless the chancellor applied an incorrect legal standard or made manifestly wrong or clearly erroneous factual findings." *Id.* (quoting *In re Bowling*, 155 So. 3d 907, 911 (¶21) (Miss. Ct. App. 2014)).

## DISCUSSION

### I. Rule 41(b) Dismissal

¶15. Patrick argues that the chancery court erred when it dismissed his case pursuant to a Rule 41(b) motion Robin made at the conclusion of the hearing. The pertinent portion of

8

Mississippi Rule of Civil Procedure 41(b) allows an involuntary dismissal by the court:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.

M.R.C.P. 41(b). "In a bench trial, a judge ruling on a motion for involuntary dismissal under Rule 41(b) 'must consider the evidence fairly, rather than in the light most favorable to the plaintiff.'" *Shows*, 238 So. 3d at 1232 (¶33) (quoting *Century 21 Deep S. Props. Ltd. v. Corson*, 612 So. 2d 359, 369 (Miss. 1992)). "If the judge 'would find for the defendant, the case should be dismissed.'" *Id*. "The judge should deny a Rule 41(b) motion 'only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case.'" *Id*.

¶16. The traditional three-pronged test for child custody modification requires the moving party to "prove by a preponderance of the evidence that (1) a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) the change adversely affects the child, and (3) the child's best interests mandate a change in custody." *Butler v. Butler*, 218 So. 3d 759, 762 (¶11) (Miss. Ct. App. 2017) (citing *Mabus v. Mabus*, 847 So. 2d 815, 818 (¶8) (Miss. 2003)). Furthermore, the change in circumstances must "clearly posit[ ] or cause[ ] danger to the mental or emotional well-being of [the] child" for the chancellor to consider a custody modification. *Giannaris v. Giannaris*, 960 So. 2d 462, 467 (¶9) (Miss. 2007) (quoting *Ballard v. Ballard*, 434 So. 2d 1357, 1360 (Miss. 1983)).

¶17. "[E]ven when the record supports a finding that a material change in circumstances

in the custodial home has occurred, the chancellor 'must separately and affirmatively determine that this change is one which adversely affects the child.'" *Butler v. Mozingo*, 287 So. 3d 980, 984 (¶14) (Miss. Ct. App. 2019) (quoting *Bredemeier v. Jackson*, 689 So. 2d 770, 775 (Miss. 1997)). "Each of these findings—a material change and adverse effect on the child—is a condition precedent to reaching and re-weighing the *Albright* factors." *Mozingo*, 287 So. 3d at 984 (¶14) (quoting *Ballard*, 434 So. 2d at 1360)). The Supreme Court has characterized changes in custody as a "jolting, traumatic experience." *Giannaris*, 960 So. 2d at 467 (¶9) (quoting *Ballard*, 434 So. 2d at 1360)). "As such 'children do not need to be bounced back and forth between their parents like a volleyball.'" *Id.* (quoting *Tucker v. Tucker*, 453 So. 2d 1294, 1298 (Miss. 1984)). Therefore, "[a]ll courts must be consistent, diligent, and focused upon the requirement that 'only parental behavior that poses a clear danger to the child's mental or emotional health can justify a custody change.'" *Id*. (quoting *Morrow v. Morrow*, 591 So. 2d 829, 833 (Miss. 1991)).

¶18.     In the present case, the chancellor preceded his discussion of the first prong (material change) by reminding the parties that the court must consider the totality of the circumstances to determine whether a material change has occurred in the custodial home, and "whether the overall circumstances are likely to remain unchanged for the foreseeable future." Furthermore, the chancellor reminded the parties that "the material change must present a genuine danger to the child." After the discussion of the evidence and testimony brought forth regarding a material change, the chancellor concluded that he was "not convinced that a material change in circumstances has occurred in the custodial home." Nevertheless, he

10

moved on to consider the second prong: whether Patrick had proved any adverse effect on J.W. from the changes presented to the chancellor.

¶19. During the hearing Patrick admitted that there was "a good relationship between J.W. and his mother." J.W. testified to participating in sports at school and hunting and fishing with his grandfather who lives next door. He described playing with the children on the family property and testified that he liked "living out there" in the country on his family's land. The chancellor noted that during his testimony, J.W. was "polite . . . intelligent, and well-adjusted" and that he appeared to enjoy living with his mother. The chancellor expressly found that he "cannot find any adverse effect on the child directly related to any material change in circumstances in the custodial home." Because there was no evidence presented at the hearing that showed an adverse effect on J.W., we cannot say that the chancellor erred in finding that Patrick failed to meet his burden of proving a material change in circumstances that adversely affected J.W. Furthermore, because the chancellor's findings regarding J.W.'s well-being were supported by substantial credible evidence, we need not discuss the third prong, and we find that the chancellor did not err in refusing to modify custody and dismissing Patrick's petition under Rule 41(b).

## II. Totality of the Circumstances

¶20. Patrick next argues that the chancellor did not consider the totality of the circumstances when he determined there were no material changes in the custodial home. "To determine whether a material change in circumstances has occurred, the court must consider the 'totality of the circumstances.'" *Butler*, 218 So. 3d at 762 (¶11) (quoting

11

*Moreland v. Spears*, 187 So. 3d 661, 663 (¶5) (Miss. Ct. App. 2016)). When a chancellor fails to consider the totality of the circumstances in determining whether there was a material change, it is considered "an incorrect, or rather, an incomplete legal standard." *Powell v. Powell*, 976 So. 2d 358, 362 (¶15) (Miss. Ct. App. 2008).

¶21. Here, however, it is clear that the chancellor understood the law and applied the correct legal standard, i.e., the "totality of the circumstances." The chancellor referred to the requirement of considering the totality of circumstances before his thorough review of the evidence and testimony and again when he concluded that "all of this taken together, this Court is not convinced that a material change in circumstances has occurred in the custodial home." The chancellor methodically discussed each of Patrick's concerns in his findings, and he discussed them in detail.

¶22. Patrick's appellate brief refers to Robin's purchase and use of alcohol in front of J.W., along with the other issues the chancellor explicitly addressed, when arguing the chancellor failed to consider the totality of the circumstances. Although alcohol use was not an issue the chancellor discussed separately, a review of pertinent testimony shows very little discussion of Robin consuming alcohol other than J.W.'s testimony that his mom occasionally had "a little glass of wine" and that he saw her pour some alcohol in a cup in the car before a ball game. More of the testimony centered around Robin's use of alcohol as a prop on her social media account, which the chancellor discussed in detail in his findings. Although no express discussion of Patrick's concerns regarding Robin's alcohol use took place at the hearing, it appears from the chancellor's discussion of her social media

behavior that the issue was certainly not overlooked when the chancellor considered the totality of the circumstances. After a thorough review of the record, this Court believes that the correct standard was applied, and therefore this issue is without merit.

## CONCLUSION

¶23. For the foregoing reasons, we affirm the judgment of the Rankin County Chancery Court dismissing Patrick's petition under Rule 41(b), and we find that the chancellor considered the totality of the circumstances as required. Substantial credible evidence supports the chancellor's findings that no adverse effects related to material changes in circumstance exist. Accordingly, the judgment of the chancery court is affirmed.

¶24. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. LAWRENCE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

13