# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01377-COA

**DAVID BEN KAY**                                                    **APPELLANT**

**v.**

**CARRIE JOE KAY**                                                    **APPELLEE**

DATE OF JUDGMENT:              11/19/2021
TRIAL JUDGE:                   HON. JOHN C. McLAURIN JR.
COURT FROM WHICH APPEALED:     RANKIN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        JOHN T. WAKELAND
ATTORNEY FOR APPELLEE:         CARRIE JOE KAY (PRO SE)
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
DISPOSITION:                   AFFIRMED IN PART; REVERSED AND
                               RENDERED IN PART - 11/22/2022
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     David Kay appeals from the Rankin County Chancery Court's judgment that found him in contempt for interfering with the visitation rights of his ex-wife Carrie Kay and modified the parties' child-custody arrangement.  On appeal, David asserts the chancellor erred by (1) finding him in contempt for failing to comply with the divorce judgment and incorporated parenting plan; and (2) ordering the children to report to the Rankin County Detention Center for detainment without a hearing if they refuse to participate in scheduled visitation with Carrie.

¶2.     As to the contempt ruling, we find substantial credible evidence supports the chancellor's determination that David willfully failed to comply with the guidelines set forth

in the couple's divorce judgment and incorporated parenting plan.  Upon review, however, we reverse and render the portion of the chancellor's judgment that directed the children to report to the Rankin County Detention Center to be detained without a hearing if they choose not to participate in future scheduled visitation with Carrie.  We therefore affirm in part and reverse and render in part the chancellor's judgment.

**FACTS**

¶3.    The Kays married in 2005.  During their marriage, they had two daughters: Shannon, born in 2006, and Haley, born in 2010.[1]  By the judgment of the Superior Court of Richmond County, Georgia, which was signed on January 25, 2016, and subsequently filed on February 17, 2016, the parties divorced.  The Georgia court adopted the Kays' agreement regarding child custody and property settlement.  Per their agreement, the Kays shared legal custody of their daughters while David retained physical custody subject to Carrie's reasonable rights of visitation.  Also per their agreement, Carrie paid David $869 each month in child support, and David retained exclusive ownership of the marital residence.

¶4.    At the time the parties initiated their divorce proceedings, they both lived in Georgia. However, prior to January 25, 2016, when the Georgia court signed the divorce judgment, David moved with the children to his parents' home in Rankin County, Mississippi.  In March 2017, Carrie, who worked as a civilian contractor for the United States military, received a job offer for a five-year position in Italy.  As the trial testimony reflected, David encouraged Carrie to accept the overseas position and assured Carrie that he would work

___

[1] We use pseudonyms to protect the minor children's privacy.

with her to make the long-distance visitation a viable option. Based in part on David's assurances, Carrie accepted the position in Italy. Following Carrie's move, David accompanied the children for an extended summer visit with Carrie in Italy. After the single trip in the summer of 2017, however, the children did not return to Italy for any further visits.

¶5. After only two years in Italy, Carrie returned to the United States in March 2019 to be closer to her children. Carrie accepted a position in Alabama and continued to work as a civil contractor for the military. In January 2020, David remarried. David, his new wife, and the parties' daughters moved into their own home in Rankin County.

¶6. In August 2020, David filed a petition with the Rankin County Chancery Court to enroll the Georgia divorce judgment in Rankin County. David sought to have the chancellor accept jurisdiction over the parties and enforce Carrie's compliance with her child-support obligation. Carrie subsequently filed with the chancery court two petitions for citation of contempt against David. The contempt petitions raised the same three claims. Specifically, Carrie asserted David was in contempt due to (1) "his steadfast failure and refusal to allow Carrie[] visitation with the two minor children as and when she is allowed to do so"; (2) his conduct in "estranging the children from their mother, not encouraging the children to visit with their mother, and interfering with Carrie's right of custody and visitation"; and (3) his continuous failure "to inform Carrie of any injuries, serious illnesses, or any medical assistance the minor children required."

¶7. In February 2021, the parties filed an agreed order requesting that the Georgia divorce judgment be enrolled in Rankin County and that the chancellor assume jurisdiction over all

3

matters involved in their divorce judgment. The chancellor held an August 5, 2021 hearing on Carrie's contempt claims against David. Carrie, David, and David's mother Petra Kay each testified.

¶8. Carrie's attorney called David as an adverse witness. David confirmed that by the time the parenting plan contained in the parties' Georgia divorce judgment went into effect, he and the children had moved to Mississippi. David agreed with Carrie's attorney that the parenting plan's provisions regarding Carrie's weekend visitation assumed that both parties lived in Georgia rather than almost eight hours apart in separate states. David further agreed that it was probably not reasonable for a person to exercise weekend visitation when the parties lived almost eight hours apart. He also testified that as far as he was aware, neither his divorce attorney nor anyone else had attempted to change the parenting plan's visitation provisions prior to the entry of the divorce judgment.

¶9. Although Carrie had lived in Italy for almost two years, David confirmed that the children only visited her during the summer of 2017 after she first moved. David testified that he had included the children's input in his decision making and could not physically force them to visit Carrie. Thus, after the children allegedly expressed a disinclination to return to Italy following their first and only trip, David did not take them to Italy any other times to visit Carrie. David further confirmed that in the week leading up to the contempt hearing, he had responded by email to Carrie's request for dinner with the children and had dictated where she could take the children and how much time she could spend with them. As David testified, he had informed Carrie in his email as to "where the girls wanted to go

4

eat dinner and what time [he] would take them there and . . . pick them up" from the restaurant.

¶10.    David acknowledged that as the children's parent, he bore a responsibility to his children to ensure they had a relationship with Carrie. David testified, however, that he was "not the conduit" for Carrie to talk to the children because everyone had access to the internet, phones, and other means of communication. David further testified that Carrie always had "consistent access to call and text the girls unless the girls ha[d] their phones taken away from them" as a disciplinary measure. Although David did not know the exact number of times the parties' older daughter Shannon had seen Carrie in the eighteen months leading up to the hearing, he stated he would not dispute Carrie's estimate of only fourteen days. David also acknowledged his responsibility to help foster a relationship of love and affection between the children and Carrie. In light of that duty, he admitted it was "[p]robably not" appropriate that the only Mother's Day card Carrie had received during the prior three years included a statement that Shannon did not want to see Carrie.

¶11.    David testified that he called Carrie "[e]xtremely rarely." In one exhibit that Carrie entered into evidence, David told Carrie via email to "[p]lease stop calling my phone. If you need to talk to me, send an [e]mail." With regard to his responsibility to keep Carrie informed about medical issues involving the children, David stated that he had informed Carrie "[i]f it's worth telling her about . . . ." David further explained that he did not generally inform Carrie about any "small procedure[s]" and probably only let her know about "routine procedures" after the fact when it was time for her to pay her half of the medical

5

bill. As for school-related issues and activities, David testified that he had never personally informed Carrie of such events or activities but knew that she received emails from the school. When questioned about his failure to directly communicate with Carrie regarding the children's school activities, David replied that it "could potentially be confusing" for Carrie if he also sent her school-related information.

¶12. Carrie also testified. She stated that during her separation from David, and prior to his move to Mississippi, she saw the children frequently and had a loving and caring relationship with them. After David moved to Mississippi, however, Carrie testified that visitation became increasingly difficult, communication with David and the children also became more difficult, and her relationship with the children became strained. Carrie further testified that communication with the children became basically impossible once she moved to Italy. Consistent with David's testimony, Carrie stated that she had discussed the job in Italy with him prior to accepting it and that David had encouraged her to take the position. Although David had refused to modify the visitation schedule to accommodate Carrie's move, Carrie testified he had assured her that the children would visit her in Italy and that he thought it would be a great opportunity for them to experience Europe. Carrie further testified that she never would have accepted the position in Italy if she had thought visitation with her children would become so problematic.

¶13. After the children's visit to Italy during the summer of 2017, Carrie was subsequently only able to exercise visitation with them by flying back to the United States. Carrie testified that in the fall of 2017 she began trying to coordinate with David for the children to come to

Italy for a Christmas visit. Carrie stated, however, that David refused to cooperate with her and finally told her "at the beginning of December that the girls would not be coming to visit" and that if she "wanted to see them, [she] had to come back to the states." As a result, Carrie had to purchase a last-minute ticket for a flight. Carrie testified that in 2018 she did not receive the amount of summer visitation provided by the parenting plan because David had arranged for the children to attend summer camps without first discussing the change with her. In March 2019, Carrie arranged to terminate her position in Italy and to move back to the United States to be closer to her children.

¶14. Carrie testified that in 2020 she had visitation with her younger daughter but that David did not even bring the parties' older daughter Shannon to the visitation exchanges. According to Carrie, David informed her that Shannon allegedly did not want to go to the visits. Carrie also received no answer to her phone calls and emails to Shannon. As a result, Carrie stated that she did not receive any visitation at all with Shannon in 2020.

¶15. During Carrie's testimony, her attorney entered into evidence multiple emails that Carrie had sent David. Carrie testified the messages represented her numerous attempts to schedule time to speak with the children and to obtain information about them from David. Carrie also testified that the emails demonstrated David's inability or refusal to communicate with her because David often completely failed to respond to her messages or only responded many hours later.

¶16. Following the hearing, the chancellor entered an order that modified the parties' child-custody agreement to afford Carrie more visitation with the children. The chancellor found

David was in contempt of the parenting plan incorporated into the divorce judgment due to David's interference with Carrie's visitation rights; his part in estranging the children from Carrie; and his failure to inform Carrie of school and medical information and activities regarding both children. To further ensure compliance with the newly modified visitation schedule, the chancellor ordered the children to report to the Rankin County Detention Center for the duration of the visitation period if they refused to participate in their scheduled visitation with Carrie. Aggrieved by the chancellor's judgment, David appeals. Carrie filed no response to David's appellate brief.

## STANDARD OF REVIEW

¶17. Our standard of review in domestic-relations matters is well established:

> This Court will not disturb a chancellor's findings unless they were manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard. Chancellors are afforded wide latitude in fashioning equitable remedies in domestic-relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record. When reviewing a chancellor's decision, we will accept a chancellor's findings of fact as long as the evidence in the record reasonably supports those findings. The chancellor's interpretation and application of the law is reviewed de novo.

*Stuckey v. Stuckey*, 341 So. 3d 1030, 1036 (¶13) (Miss. Ct. App. 2022) (citations and internal quotation marks omitted).

## DISCUSSION

¶18. As an initial matter, we address Carrie's failure to file a brief in response to David's appellate brief. In such instances, this Court may follow one of two courses:

> First, we may take the appellee's failure to file a brief as a confession of error and reverse. This option is favored when the record is complicated or of large

8

volume and the case has been thoroughly briefed by the appellant with apt and applicable citation of authority so that the brief makes out an apparent case of error. However, if the record can be conveniently examined and such examination reveals a sound and unmistakable basis or ground upon which the judgment may be safely affirmed, we may disregard the appellee's error and affirm.

*Hatton v. Hatton*, 323 So. 3d 1149, 1153 (¶7) (Miss. Ct. App. 2021) (quoting *Jay Foster PLLC v. McNair*, 175 So. 3d 565, 571 (¶15) (Miss. Ct. App. 2015)).

¶19. Upon review, we conclude that Carrie's failure to file a responsive brief should not be dispositive of this appeal. Where a matter involves issues of child custody, "this Court is compelled to review the record, despite the appellee's failure to file a brief." *Shows v. Cross*, 238 So. 3d 1224, 1232 (¶31) (Miss. Ct. App. 2018) (citation and internal quotation mark omitted). Here, the parties raised issues involving child custody, and the chancellor's judgment ultimately modified their child-custody arrangement. Moreover, the record is easily examined and presents a sound basis upon which we can affirm the chancellor's finding of contempt against David. As previously discussed, however, we conclude the chancellor erred by requiring the parties' children to report to the Rankin County Detention Center without a hearing if they fail to participate in scheduled visitation with Carrie. We therefore reverse and render that portion of the chancellor's judgment.

## I. Contempt

¶20. Without citation to any relevant authority, David contends that the chancellor erroneously found he was in contempt of the child-custody agreement. As discussed, Carrie alleged David had willfully (1) failed and refused "to allow Carrie[] visitation with the two minor children as and when she is allowed to do so"; (2) "estrang[ed] the children from their

9

mother, not encourag[ed] the children to visit with their mother, and interfer[ed] with Carrie's right of custody and visitation"; and (3) failed "to inform Carrie of any injuries, serious illnesses, or any medical assistance the minor children required."

¶21. "Whether a party is in contempt is a question of fact to be decided on a case-by-case basis. A chancellor has substantial discretion in deciding contempt matters because of the chancellor's 'temporal and visual proximity' to the litigants." *Shows*, 238 So. 3d at 1234 (¶43) (quoting *Gilliland v. Gilliland*, 984 So. 2d 364, 369-70 (¶19) (Miss. Ct. App. 2008)). As we have previously explained,

> [t]he primary purpose of a civil-contempt order is to enforce compliance with a court order. Failure to comply with a court order is prima facie evidence of contempt. To rebut a prima facie case of contempt, a defendant must show an inability to pay, that the default was not willful, that the provision violated was ambiguous, or that performance was impossible. An adjudication of civil contempt must be proved by clear and convincing evidence.

*Warner v. Warner*, 341 So. 3d 152, 166 (¶45) (Miss. Ct. App. 2022) (citations and internal quotation marks omitted).

¶22. At the hearing, David acknowledged that he had encouraged Carrie to accept the five-year position in Italy but that he had only taken the children to visit her one time during the two-year period she lived there. David also failed to refute Carrie's testimony that in 2018 she did not receive her entire amount of summer visitation because David had enrolled the children in summer camps without consulting her or that in 2020 she did not receive any visitation with the parties' older daughter. In addition, David failed to refute Carrie's evidence that he routinely failed to respond to her communication attempts or to keep her informed of pertinent educational and medical issues involving the children. As

10

demonstrated by the hearing exhibits, David informed Carrie at one point via email to stop calling his phone and to send an email if she needed to speak with him. David also admitted during his testimony that he called Carrie "[e]xtremely rarely" and only informed her of medical issues "[i]f it's worth telling her about . . . ." Moreover, he testified that he had never personally informed Carrie of any of the children's school events or activities.

¶23. After reviewing the record, we find no error in the chancellor's decision to hold David in contempt. Substantial credible evidence supported the chancellor's finding that David had violated the provisions of the parenting plan incorporated into the parties' divorce judgment. We therefore conclude that this assignment of error lacks merit.

## II. Visitation

¶24. David also challenges the portion of the chancellor's judgment holding "that in the event the children choose not to visit with [Carrie,] then they shall report to the Rankin County Detention Center at the time appointed for visitation and . . . shall remain there until such time as visitation would have ended." David argues the "children are entitled to some type of hearing before being sent to detention" and that the children "should be allowed some flexibility or a hearing if this issue should arise." Upon review, we agree.

¶25. Our caselaw provides that in certain instances "a non-party to a lawsuit may be sanctioned" or held in contempt. *State Farm Mut. Auto. Ins. Co. v. Jones*, 37 So. 3d 87, 91 (¶10) (Miss. Ct. App. 2009). For example, Mississippi Rule of Civil Procedure 37(b)(1) states that "[i]f a deponent fails to be sworn or to answer a question after being directed to do so by the court, the failure may be considered a contempt of court." In addition,

11

Mississippi Rule of Civil Procedure 45(g) provides that the "[f]ailure by any person without adequate excuse to obey a subpoena served upon him may be deemed a contempt of the court from which the subpoena issued." Here, no such situation arose. Although the minor children were indeed at the heart of the parties' dispute with one another, the children themselves were not litigants or deponents in the matter and were not in danger of failing to respond to a subpoena.

¶26.    As our caselaw recognizes,

> [i]t is a cardinal principle in the administration of justice that no man can be condemned, or divested of his rights, until he has had an opportunity of being heard. He must, by service of process, by publication of notice or in some equivalent way, be brought into court, and if judgment be rendered against him before that is done, the proceedings will be as utterly void as though the court had undertaken to act where the subject matter was not within its cognizance.

*State Farm*, 37 So. 3d at 91 (¶9) (quoting *First Jackson Sec. Corp. v. B.F. Goodrich Co.*, 253 Miss. 519, 541, 176 So. 2d 272, 282 (1965)).

¶27.    In his bench ruling, the chancellor explained his intent was not to actually lock up the parties' children but to give them an option or choice that ultimately encouraged visitation with their mother in conformity with the divorce judgment. Adherence to a lawful court order is a vital component to a successful system of law. Although the chancellor's solution was well-intentioned, we find that to the extent his decision required the children to be taken into custody and held without due process or a hearing, we must reverse and render that part of his judgment.

**CONCLUSION**

¶28.    Because substantial credible evidence supported the chancellor's determination that

12

David was in contempt of the child-custody provisions of the divorce judgment, we affirm that holding. As to the finding that the children should be held without a hearing at the Rankin County Detention Center if they refuse to participate in visitation with Carrie, we reverse and render that portion of the chancellor's judgment.

¶29. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**